UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NICOLE W. PATRICK,<br><br>      Plaintiff,<br><br>  vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>      Defendant. | 4:18-CV-04150-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**Table of Contents**

INTRODUCTION ................................................................................. 1

FACTS ............................................................................................... 2

 A. Statement of the Case ............................................................. 2

  1. Initial Application and Proceedings ........................................ 2

  2. ALJ Decision ........................................................................ 2

  3. Appeals Council Review ........................................................ 8

 B. Plaintiff's Age, Education and Work Experience ........................ 10

 C. Relevant Medical Evidence ..................................................... 10

  1. Tschetter & Holm Clinic Records ......................................... 10

  2. Community Counseling Services Records .............................. 23

  3. Chiropractic Treatment Records .......................................... 48

  4. South Dakota Human Services Center (HSC), Yankton, SD .... 48

  5. State Agency Assessments ................................................. 49

 D. Testimony at the ALJ Hearing ................................................ 50

  1. Ms. Patrick's Testimony ...................................................... 50

  2. Ms. Patrick's Mother's Testimony ........................................ 52

  3. Vocational Expert Testimony: ............................................. 52

 E. Disputed Facts .................................................................... 53

DISCUSSION ...................................................................... 53

   A.   Standard of Review .................................................... 53

   B.   The Disability Determination and the Five-Step Procedure ........ 55

   C.   Burden of Proof......................................................... 56

   D.   The Parties' Positions ................................................. 57

   E.   Step Two ................................................................. 57

   F.   Step Three ............................................................... 64

   G.   Step Four ................................................................ 72

      1.   Law Applicable to Step Four ................................... 73

      2.   Fibromyalgia .................................................... 76

      3.   Migraines ........................................................ 81

      4.   Mental Impairments ............................................ 89

   H.   Step Five................................................................. 102

      1.   Jobs Available "Nationally" ................................... 102

      2.   DOT Descriptions of Jobs and the ALJ's Mental RFC ............ 106

   I.   Type of Remand ....................................................... 108

CONCLUSION.................................................................... 109

## INTRODUCTION

Plaintiff, Nicole Patrick, seeks judicial review of the Commissioner's final decision denying her application for social security disability and supplemental security income disability benefits under Title II and Title XVI of the Social Security Act.[1]

Ms. Patrick has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits. See Docket Nos. 1 & 19. Alternatively, Ms. Patrick requests the court remand the matter to the Social Security Administration for further proceedings. Id.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. Patrick filed her application for both types of benefits. AR201, 209, 244, 268, 276. Her coverage status for SSD benefits expires on December 31, 2020. AR32. In other words, in order to be entitled to Title II benefits, Ms. Patrick must prove disability on or before that date.

consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A. Statement of the Case

#### 1. Initial Application and Proceedings

This action arises from plaintiff, Nicole W. Patrick's (Ms. Patrick), application for SSDI and SSI benefits filed on September 14, 2015, alleging disability since September 4, 2015, due to depression, anxiety, fibromyalgia, migraines, and problems with her back and right shoulder. AR201, 209, 244, 268, 276 (citations to the appeal record will be cited by "AR" followed by the page or pages).

Ms. Patrick's claim was denied initially and upon reconsideration. AR132, 139, 146. Ms. Patrick then requested an administrative hearing. AR153.

#### 2. ALJ Decision

Ms. Patrick's administrative law judge ("ALJ") hearing was held on October 12, 2017, by Lyle Olson. AR48. Ms. Patrick was represented by other counsel at the hearing, and an unfavorable decision was issued on February 6, 2018. AR27, 48.

---

[2] These facts are gleaned from the parties' stipulated statement of facts (Docket 18). The court has made only minor grammatical and stylistic changes except in describing the ALJ's decision, to which additional detail was added.

At Step One of the evaluation, the ALJ found that Ms. Patrick was insured for benefits through December 31, 2020, and that she had not engaged in substantial gainful activity ("SGA"), since September 4, 2015, the alleged onset of disability date. AR32. At Step Two, the ALJ found that Ms. Patrick had severe medically determinable impairments of migraine headaches; fibromyalgia; major depression, recurrent, moderate, with anxiety; other specified obsessive compulsive and related disorders; dysthymic disorder; and a personality disorder, unspecified. AR32.

At Step Three, the ALJ found that Ms. Patrick did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (hereinafter referred to as the "Listings"). AR33. The ALJ considered Ms. Patrick's mental impairments—singly and in combination--under Listings 12.04 and 12.06, and found that Ms. Patrick had moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations with concentration, persistence or maintaining pace; and moderate limitations in adapting or managing herself. AR33-34. To meet the listing, Ms. Patrick had to demonstrate at least one "extreme" or two "marked" limitations in these areas of functioning, so the ALJ's conclusion she suffered from only "moderate" limitations led to the conclusion Ms. Patrick did not meet the listing. Id.

Although Ms. Patrick testified she had poor memory and difficulty understanding both written and spoken instructions, the ALJ found the evidence contradicted this testimony. Id. Specifically, her medical records

3

routinely described her as alert and oriented in all spheres. Id. In addition, she was the representative payee for her children's disability payments, she was able to drive, and play card games. Id. The ALJ concluded these activities were consistent with the "moderate" limitations he found to exist. Id.

In interacting with others, the ALJ noted Ms. Patrick's medical records routinely described her as pleasant and cooperative and she had never been fired or laid off from a job due to problems getting along with others. Id. This evidence was not consistent with Ms. Patrick's testimony that she has difficulty getting along with others, avoids being around people, and struggles to get along with supervisors. Id.

With regard to concentrating, persisting, or maintaining pace, the ALJ again found a discrepancy between Ms. Patrick's demonstrated abilities and her description of those abilities. Id. While Ms. Patrick stated she has poor concentration and attention, the ALJ noted she displayed normal attention, concentration and focus in mental health sessions, she watches television and movies, plays cards, handles finances, and can drive. Id.

Regarding adapting and managing oneself, the ALJ noted Ms. Patrick was routinely described as well-groomed in records of office visits, she was able to leave her house unaccompanied, she managed her household, cared for pets, and provided for her two disabled sons. AR34. This did not correlate with Ms. Patrick's self-described limits of not handling changes in her routine well, needing reminders to attend to her personal care, and to take medication. Id.

The ALJ also concluded Ms. Patrick had failed to establish the existence of a mental disorder over a period of at least two years, and evidence of both medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of her mental disorders; and marginal adjustment—that is, minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life.  Id.

The ALJ determined that Ms. Patrick had the residual functional capacity ("RFC") to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b).
> Specifically, the claimant can lift and/or carry 20 pounds
> occasionally and 10 pounds frequently.  The claimant can sit with
> normal breaks for a total of about 6 hours in an 8-hour workday,
> and stand and/or walk with normal breaks for a total of about 6
> hours in an 8-hour workday.  The claimant can occasionally climb
> ramps and stairs, balance, stoop, kneel, crouch and crawl, but
> never climb ladders or scaffolds, work at unprotected heights, or
> work with dangerous moving mechanical parts.  Mentally, the
> claimant retains the ability to understand, remember and carry out
> short, simple instructions and interact appropriately with
> supervisors and co-workers on an occasional basis.  The claimant
> should have no interaction with the public.  The claimant can
> respond appropriately to changes in a routine work setting only
> and make judgments on only simple work-related decisions.  The
> claimant must work in isolation or in small groups of people not to
> exceed five or six in number.  Lastly, the claimant is limited to
> goal-oriented work (defined as work where the claimant is given a
> task or series of tasks to perform and it does not matter when the
> task is accomplished so long as completed by end of the workday
> or work shift).

AR34-35.  The ALJ stated that this RFC reflected the moderate limitations the ALJ had previously established deriving from Ms. Patrick's mental impairments as discussed above.  AR34.

5

The ALJ's subjective symptom finding was that Ms. Patrick's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, but her statements concerning the intensity, persistence and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR35.

The ALJ considered the opinions of the State agency psychological consultants and gave them "less weight" because they found Ms. Patrick's mental impairments nonsevere and did not have the benefit of reviewing additional evidence adduced at the ALJ hearing. AR38. The ALJ considered the opinions of the State agency medical consultants as to Ms. Patrick's physical functioning, and gave those opinions "more weight" but did not explain more than that, stating only that "the record supports the claimant would be able to perform work within a light exertional level." AR38.

The ALJ considered the Mental Impairment Questionnaire filled out by Lyle Christopherson, D.O., Ms. Patrick's treating psychiatrist. AR38. Dr. Christopherson had opined Ms. Patrick could not function well without assistance, there was "no way" she could perform her past job, she was completely unable to function independently outside the home, and she would likely miss four or more days of work a month due to her mental impairments. Id. Dr. Christopherson opined Ms. Patrick was "markedly" limited in her ability to attend to activities of daily living, maintain social functioning, and maintain concentration, persistence and pace. Id.

The ALJ gave Dr. Christopherson's opinions "less weight" because they were "grossly inconsistent with the record as a whole." AR38. The ALJ stated that Dr. Christopherson's treatment records "routinely describe the claimant as having good eye contact, and open and cooperative, even at times 'cheerful' with 'overall appropriate affect.'" AR38. The ALJ also asserted that many times Dr. Christopherson indicated Ms. Patrick's mental health was "stable" or that she was doing "well." AR38. The ALJ noted that Ms. Patrick's ability to assist in the caring of her disabled children, mother, and grandmother was not consistent with Dr. Christopherson's opinion. AR38. The ALJ then asserted that overall Dr. Christopherson's treatment notes were not consistent with the severe limitations set forth in his opinion. AR38.

The ALJ stated that the RFC it determined was supported by the "longitudinal record" and although he accepted that Ms. Patrick's impairments would somewhat erode her functional ability the medical evidence did not support the degree of limitations she alleged. AR38. The ALJ also noted that Ms. Patrick is able to care for her disabled sons and acts as the representative payee for them, attends appointments on her own, and admits to helping her mother and grandmother. AR38.

Additionally, the ALJ pointed out that Ms. Patrick admitted to having migraine headaches since age nine and fibromyalgia for years prior to the alleged onset date, but "was able to work with these impairments in the past with no mention of remarkable deterioration or worsening of her physical conditions." AR39. The ALJ stated that "[f]indings upon physical examination

do not display any sort of abnormal gait or weakness.  Her neurological exams have been described as non-focal and she has not engaged in any sort of physical therapy or injections for her fibromyalgia, which one would expect to see given allegations of disabling pain."  AR39.

The ALJ considered the testimony of Ms. Patrick's mother and "accepts this testimony and gives it some weight, as it gives insight into the claimant's daily life."  AR37-38.  The ALJ then stated that by virtue of her relationship to Ms. Patrick she "cannot be considered a disinterested third-party witness whose testimony would not tend to be colored by affection for the claimant...."  The ALJ also stated that "most importantly" more weight could not be given to the witness's statement because it was "not consistent with the lack of more noteworthy treatment and objective findings contained in this case."  AR38.

Based on the RFC determined by the ALJ at Step Four, the ALJ found that Ms. Patrick was not capable of performing her past relevant work.  AR39.  At Step Five, the ALJ found Ms. Patrick capable of adjusting to other work that existed in significant numbers such as document scanner, DOT# 207.685-018; laundry worker, DOT# 261.687-014; and routing clerk, DOT# 222.587-038, relying on testimony from the vocational expert regarding the number of jobs available for each occupation nationally and denied the claim.  AR40.

### 3.    Appeals Council Review

Ms. Patrick timely requested review by the Appeals Council on January 18, 2018, and submitted additional evidence in the form of a letter from

Ms. Patrick's treating psychiatrist dated February 7, 2018. AR22-24. The Appeals Council granted review of the ALJ's decision and found that the decision was not supported by substantial evidence because the ALJ did not evaluate Ms. Patrick's complaints of back and arm pain. AR5, 11.

The Appeals Council stated that Ms. Patrick partially alleged disability based on back and arm pain and provided evidence of treatment for back and arm pain. AR12. The Appeals Council concluded there was no objective medical evidence of an impairment that could cause arm and back pain. The Appeals Council pointed out that physical examination and diagnostic imaging of the spine and arm did not yield evidence of an impairment. AR12. The Appeals Council also noted that Ms. Patrick reported back pain for most of her life, but that back pain did not previously prevent her from working and the record did not indicate any deterioration in back pain. AR12. The Appeals Council then asserted that because Ms. Patrick's treatment for these conditions was "routine and conservative" and "effective" they "would appear to be nonsevere if they were medically determinable." AR12.

The Appeals Council adopted the ALJ's findings under Steps 1, 2, 3, 4 and 5 including that "she is not capable of performing past relevant work and that there is not a significant number of jobs the claimant is capable of performing." AR4. The Appeals Council then concluded Ms. Patrick could perform other jobs that existed in significant numbers identifying the same occupations included in the ALJ's decision,

including "laundry worker (DOT# 261.687-014)." AR6. The Appeals Council denied the claim on September 25, 2018, making the Appeals Council's decision the final decision of the Commissioner. AR6.

## B. Plaintiff's Age, Education and Work Experience

Ms. Patrick was born in July of 1972, making her 46 years old at the time of the denial, and she did not complete high school but received a GED in 1993. AR204, 245. Ms. Patrick reported she worked as a residential aide and a home health aide and had consistent earnings in excess of substantial gainful activity ("SGA") until the alleged onset of disability. AR37, 222, 333.

## C. Relevant Medical Evidence

### 1. Tschetter & Holm Clinic Records

The earliest treatment record in the appeal file related to Ms. Patrick's physical impairments was for September 22, 2014, when she was seen for constipation, back pain and migraines by William J. Miner, M.D. AR497. Her medications included hydrocodone;[3] Fluoxetine;[4] Seroquel;[5] and Imitrex.[6]

---

[3] Hydrocodone is a narcotic prescribed for moderate to severe pain. See https://www.webmd.com/drugs/2/drug-251/hydrocodone-acetaminophen-oral/details. All internet citations in this opinion were last checked August 14, 2019.

[4] Fluoxetine is a medication used to treat depression. See https://www.webmd.com/drugs/2/drug-1774-95/fluoxetine-oral/fluoxetine-oral/details.

[5] Seroquel is an anti-psychotic medication. See https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details.

[6] Imitrex is a medication used to treat migraines. See https://www.webmd.com/drugs/2/drug-11571/imitrex-oral/details.

AR497.  Her past history references a magnetic resonance imaging ("MRI") scan of her brain that was negative and an MRI of her back.  AR497.  Examination revealed a flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination; and no skin rashes or lesions.  AR498.  Ms. Patrick's assessments included back pain – 724.5 (Primary), migraine headaches, and hot flashes.  AR498.  Ms. Patrick's planned treatment included a lumbar epidural.  AR498.  The epidural was administered at the hospital on September 24, 2014.  AR386.

Ms. Patrick saw Dr. Miner for follow-up on her back pain on October 13, 2014, and reported the epidural had provided some relief, but she still had low back pain and complained of fatigue and headaches.  AR494.  Ms. Patrick's back pain persisted, she had no falls, spells or new symptoms.  AR494.  Ms. Patrick also reported that her mood was "ok" and that her bowels were moving.  AR494. The record again references prior back and negative brain MRIs.  AR494.  Examination again found flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions.  AR495. Ms. Patrick's assessments included irritable bowel syndrome ("IBS") in addition to back pain.  AR495.  Dr. Miner told her to continue to take hydrocodone for her back pain and Linzess for her IBS.  AR495.

Ms. Patrick was seen on December 15, 2014, with ongoing complaints of migraines, IBS, and back pain.  AR491.  Ms. Patrick reported that the Linzess

was working well and that she was doing better on Seroquel with no new symptoms, no chest pain, blood pressure was good, stable fatigue, and no spells or falls. AR491. The records again referenced prior back and negative brain MRIs, and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions. AR491-92. Ms. Patrick had requested a medication more affordable than Seroquel and it was changed to Topamax. AR491-92. Hydrocodone was continued for back pain. AR492.

Ms. Patrick saw Dr. Miner on December 30, 2014, with ongoing complaints of migraines and back pain. AR488. Ms. Patrick reported that she was doing "so-so," but that her migraines were better. AR488. The records again referenced prior back and negative brain MRIs, and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions. AR488-89. Ms. Patrick reported that her lower back pain/fibromyalgia pain was excruciating and affecting her home and work life. AR488. She inquired about another epidural. AR488. Her assessments were radicular lumbar pain and migraine headaches, and another epidural was planned and her Topamax dosage was increased for her migraines. AR489. Ms. Patrick was given the epidural at the hospital on December 31, 2014. AR388.

Ms. Patrick saw Dr. Miner on February 2, 2015, and reported that her migraines and back pain were worse. AR485. Ms. Patrick also noted that her headaches had improved. AR485. The record again referenced prior back and negative brain MRIs, and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions. AR485-86. Hydrocodone was continued. AR486.

Ms. Patrick saw Dr. Miner on March 2, 2015, and reported ongoing back pain more on the right side and was seeing a chiropractor. AR482. She also completed of extreme fatigue and worsening short-term memory. AR482. The records again referenced prior back and negative brain MRIs, and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination; and no skin rashes or lesions. AR482-83. Her Topamax dosage was decreased and labs were ordered due to her fatigue. AR483.

Ms. Patrick saw Dr. Miner on March 16, 2015, and reported ongoing right sided radicular pain, worsening migraines when taking Singulair. AR477. The records again referenced prior back and negative brain MRIs and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination; and no skin rashes or lesions. AR477, 480. Ms. Patrick was assessed with back pain and she received another epidural that same date. AR391.

Ms. Patrick saw Dr. Miner on April 9, 2015, for ongoing migraines and cold-like symptoms. AR474. The records again referenced prior back and negative brain MRIs, and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination; and no skin rashes or lesions. AR474-75. Dr. Miner gave Ms. Patrick samples of Cymbalta for one week then was to change to Brintellix for her migraines. AR475.

Dr. Miner saw Ms. Patrick on April 27, 2015, for ongoing migraines and the records again referenced prior back and negative brain MRIs, and examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination; and no skin rashes or lesions. AR471-72. The reasons for her visit included her migraines being worse with Brintellix, and under the history of present illness it stated that "mood much better on brintilix – headaches stable..." AR471. Ms. Patrick was told to wean off Prozac then increase her Brintellix dosage. AR472.

Ms. Patrick's medical exam records continue to consistently reference a prior MRI of her back and a prior normal brain MRI throughout her treatment notes. Ms. Patrick saw Dr. Miner on May 13, 2015, for ongoing migraines, back pain, anxiety. AR468. She reported she had stopped her Prozac but was feeling very jittery. AR468. Ms. Patrick's assessments included depression with anxiety and her Brintellix dosage was increased again, and fibromyalgia

for which she was given Depo Medrol intramuscular injection (Decadron).  AR469.

Ms. Patrick saw Dr. Miner on May 22, 2015, for fibromyalgia and depression with anxiety and reported ongoing back pain with some improvement after the steroid shot and chiropractic care.  AR465.  Ms. Patrick complained of "n&v" with the higher dosage of Brintellix, but reported improvement with her previous dose.  AR465.  Her examination showed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination; and no skin rashes or lesions.  AR465-66.  Her Brintellix was stopped and Wellbutrin prescribed.  AR466.

Ms. Patrick saw Dr. Miner on June 22, 2015, and hydrocodone was continued for back pain.  AR459.  Ms. Patrick reported that she was doing "so-so," and had no issues with her medications, and that her blood pressure was at its goal.  AR459.  Propranolol was stopped for her migraines, Verapamil prescribed, and a Zofran injection administered.  AR460.

Ms. Patrick saw Dr. Miner on July 21, 2015, for continued back pain and migraines.  AR456.  She had received an epidural injection the prior day (AR425), and reported increased migraines with dizziness and nausea.  AR456.  Ms. Patrick also reported that she was tolerating the medication Abilify well, had an ok mood, and had no other new symptoms.  AR457.  A fentanyl patch was prescribed for her back pain.  AR457.

Ms. Patrick was seen on August 18, 2015, for continued back pain and migraines. AR453. She reported feeling very anxious, having bad headaches the last three days, and said her "back is still hurting, relief with patch-needs refill." AR453. The fentanyl patches were continued for her migraine headaches and Klonopin prescribed for her anxiety. AR454.

Ms. Patrick saw Dr. Miner on August 22, 2015, and reported being back at work and feeling extremely anxious and feeling like she could "cry at any moment." AR450. Her assessments were anxiety and fatigue, and her Abilify dosage was increased and she received a Decadron steroid injection. AR451.

Ms. Patrick saw Dr. Miner on September 1, 2015, and reported she had quit her job and was feeling very anxious and wanted to discuss social security due to migraines, anxiety, depression, etc. and she was scheduled to see Dr. Christopherson. AR445. Ms. Patrick reported that she was taking Abilify as directed and it seemed to be helping her mood. AR445. Lab tests revealed a positive A ANA SCREEN EIA.[7] AR447.

Ms. Patrick saw Dr. Miner on September 17, 2015, and reported her mood was better, but her back was "killing" her. AR443. Dr. Miner noted that Dr. Christopherson had discontinued Ms. Patrick's Abilify, and started Prozac and one other medication. AR443. Examination revealed flat affect; normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in

---

[7] A positive ANA screen means antinuclear antibodies (ANA) are present in one's blood. In most cases, that means one's immune system has launched a misdirected attack on one's own tissue—an autoimmune reaction. However, some people who are healthy will still register a positive ANA test. See https://mayoclinic.org/tests-procedures/ana-test/about/pac-20385204.

the extremities; non-focal neurological examination; and no skin rashes or lesions. AR443. Hydrocodone was continued for her back pain and a Decadron steroid injection was administered. AR443-44.

Ms. Patrick saw Dr. Miner on October 2, 2015, for follow-up for back pain. AR441. She reported the back pain comes and goes but it was better, and she had "bad" migraines. AR441. Ms. Patrick returned on November 2, 2015, for her continued back pain and migraines, and Dr. Miner continued hydrocodone as needed for her migraines. AR439.

Ms. Patrick saw Dr. Miner on February 2, 2016, with reports of right shoulder pain for the last month and an inability to raise her right arm. AR509. She reported that she needed a new prescription for fentanyl and hydrocodone. AR509. She had tried chiropractic treatment for her shoulder. AR509. Ms. Patrick's assessments included low back pain without sciatica and chronic pain syndrome (G89.4) associated with significant psychosocial dysfunction. AR509. Her pain medications were continued and she received a Decadron steroid injection. AR510.

Ms. Patrick saw Dr. Miner on March 3, 2016, with worsening right shoulder pain, which was worse with movement and better with rest. AR609. Examination revealed pain in the right shoulder muscles, but the joint appeared stable and extremities were without edema or cyanosis. AR610. Her low back pain patches were continued and she received a lidocaine injection in her shoulder. AR610.

Ms. Patrick saw Dr. Miner on April 4, 2016, with ongoing right shoulder pain, and she complained of vertigo and dizziness upon standing. AR606. She received a Decadron injection and samples of Lyrica were given. AR607. When she was seen a week later her right shoulder pain had improved with treatment, but she reported a migraine for the past three days. AR603. Dr. Miner prescribed Lyrica and she received injections of Reglan, Decadron, and Toradol for her migraine. AR604.

Ms. Patrick saw Dr. Miner on April 26, 2016, to follow-up on her shoulder and migraines and reported her shoulder was somewhat better, and her headaches were better controlled. AR600. Examination was normal aside from pain in the muscles of the right shoulder and a flat affect. AR601. Ms. Patrick's assessments included abnormal broad-based gait, right shoulder pain, visual distortion, migraine aura, persistent intractable, and tremor. AR601. Dr. Miner continued hydrocodone and provided Lyrica samples. AR601.

Ms. Patrick saw Dr. Miner on June 2, 2016, for her migraines, back pain and IBS. AR597. She reported that her depression and anxiety had been "up and down" and that she was having "some migraines." AR597. Ms. Patrick was described as having some significant psychiatric disease but was seeing psychiatry and doing reasonably well. AR597. Examination was normal except for a flat affect and her assessments included migraines treated with Duragesic (fentanyl) patches and chronic pain syndrome treated with Lyrica and a Decadron injection. AR599.

Ms. Patrick saw Dr. Miner on July 1, 2016, for follow up on her migraines, back pain and IBS. AR594. Dr. Miner noted that Ms. Patrick was overall "doing well" over the last month and admitted to improved arm and chronic pain, stable back pain, and regular bowels. AR594. Ms. Patrick was having some migraines "on and off" quite frequently. AR594. Her medications were continued and she received Toradol and Decadron injections. AR595. Examination was normal aside from a flat affect. AR595. Ms. Patrick's doctor stated, "at this point with her chronic migraines[,] back pain[,] psychiatric issues[,] she is unable to do much more than care for self. Certainly would warrant to be reasonable to have her on disability." AR595.

Ms. Patrick saw Dr. Miner again on August 1, 2016, and August 29, 2016, with ongoing migraines, back pain and depression. AR588, 591. On August 1, 2016, Ms. Patrick stated she had good days then bad days and had two really bad weeks. AR591. Ms. Patrick noted to be doing "reasonably well," with an improved mood and regular bowels; but ongoing migrainous headaches, back pain, and "some" depression. AR591. On August 29, 2016, Ms. Patrick was noted to be "doing well" with "slightly better" mood and well-controlled pain. AR588.

Ms. Patrick saw Dr. Miner again on September 26, 2016, for her depression, migraines, and pain and reported that her fibromyalgia had flared up about five to six days ago and she had been depressed for about three days. AR582. Ms. Patrick was noted to be a somewhat rambling historian, but had arthralgias, myalgias, and had a typical fibromyalgia flare. AR582. She had a

flight of ideas rambling between her joint pain, nasal congestion, cough, or depression due to her living situation. AR582. She was assessed with fibromyalgia and given prednisone and Decadron injections. AR583-84.

Ms. Patrick saw Dr. Miner on October 25 2016, and reported worsening migraines and some issues with anxiety, bowels, and chronic headaches. AR580. Examination was normal aside from a flat affect. AR580. Her Lyrica dosage was increased. AR580.

Ms. Patrick saw Dr. Miner on November 8, 2016, for a two-week follow-up. AR578. Ms. Patrick was assessed with migraine headaches and received Decadron, Toradol, and Reglan injections. AR578.

Ms. Patrick saw Dr. Miner on December 22, 2016, with ongoing symptoms and her hydrocodone was continued, phentermine was prescribed for her weight, and she received Decadron and Toradol injections. AR574.

Ms. Patrick saw Dr. Miner on March 9, 2017, and reported not "feeling good," being really depressed and having anxiety and her psychiatrist had increased her anxiety medication. AR890. Ms. Patrick also reported that her migraines had increased due to stress and her lower back had been hurting more even with her pain pills. AR890. Examination was normal aside from a flat affect. AR890. She received a Decadron injection. AR891.

Ms. Patrick saw Dr. Miner on January 12, 2017, for follow-up regarding weight loss. AR894. Ms. Patrick reported headaches, being more depressed and anxious the last two weeks, and some chronic back pain. AR894. Examination showed normal affect, proper orientation, normal heart and lung

sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions. AR894. Her assessments included migraines, IBS, depression, and fatigue. AR894.

Ms. Patrick saw Dr. Miner on March 23, 2017, and Dr. Miner assessed Ms. Patrick with migraines without status migrainosus, non-intractable, unspecified migraine type. AR1313. She received Toradol and Decadron injections. AR1313.

Ms. Patrick saw Dr. Miner on April 10, 2017, and reported being more depressed and anxious and her Obsessive Compulsive Disorder ("OCD") was worse. AR1310. Her examination was normal except that her affect was flat and she continued with psychiatry. AR1311.

Ms. Patrick saw Dr. Miner on May 16, 2017, and reported feeling "up and down" and having more migraines. AR1307. Dr. Miner adjusted Ms. Patrick's medications to control her headaches and noted that Ms. Patrick was doing "quite well" with psychiatry. AR1307. Her medications included duragesic or fentanyl patches, hydrocodone, Topamax, Lyrica, Senna, clonazepam, Zyprexa, Prozac, Linzess, Focalin, and Imitrex. AR1307. Examination showed normal affect, proper orientation, normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions. AR1308. The dosage of her fentanyl patches was increased. AR1308.

Ms. Patrick saw Dr. Miner on June 6, 2017, and the general history noted that her headaches had improved with fentanyl, but since the fentanyl

dosage had been increased she reported feeling more hyper, had hives, had difficulty thinking, and was feeling more aggressive toward her mother. AR1305.  She denied any abdominal problems, headaches, or changes in vision or hearing.  AR1305.  Examination showed normal affect, proper orientation, normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions.  AR1305.

Ms. Patrick saw Dr. Miner on July 11, 2017, for follow-up after being discharged from the Human Services Center on July 7, 2017, following 10 days of inpatient mental health treatment.  AR964, 1301.  Ms. Patrick continued to report back pain, the reason for the appointment included that she had "lots of meds changes doing well," and she denied depression, anxiety, bowel changes or headaches.  AR1301.  Examination showed normal affect, proper orientation, normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions.  AR1307.

Ms. Patrick saw Dr. Miner again on July 25, 2017, and stated that she had been "feeling pretty good," denied any depression or anxiety, but admitted to back pain.  AR1299.  Imitrex was added back to her medications for migraine headaches, and her assessments included backache, unspecified for which Celebrex was prescribed.  AR1299.

Ms. Patrick saw Dr. Miner on August 25, 2017, and was noted to be "feeling okay" and "doing well."  AR1297.  Ms. Patrick complained of

intermittent headaches and back pain but stated that her back pain was a little better.  Examination showed normal affect, proper orientation, normal heart and lung sounds; supple neck; soft abdomen; no edema or cyanosis in the extremities; non-focal neurological examination, and no skin rashes or lesions. AR1297.

### 2. Community Counseling Services Records

Ms. Patrick was seen for an initial examination by Lyle Christopherson, DO, a psychiatrist, on September 16, 2015.  AR429.  Ms. Patrick stated "I've never had depression like this."  AR429.  Ms. Patrick reported being a single mother since her husband committed suicide in 2000, and that she had recently quit her job of eight years.  AR429.  Dr. Christopherson stated Ms. Patrick was well known to him because he also treated her two boys, both who had some variant of schizoaffective disorder.  AR429.  Dr. Christopherson also noted a history of chronic back pain secondary to a motor vehicle accident when Ms. Patrick was a teen, fibromyalgia, and migraine headaches.  AR429.  Ms. Patrick was taking Cymbalta, Prozac, Abilify, Klonopin, fentanyl patches, and hydrocodone.  AR429-30.

In the mental examination section, Dr. Christopherson noted that Ms. Patrick was a female well known to him who always appeared depressed, had some difficulties processing things, and got no joy out of life with "always being in pain and everything hurt[ing]."  AR429.  Dr. Christopherson also noted that Ms. Patrick was alert and oriented but complained of chronic worry; recent problems with concentration, comprehension, and focus; fatigue even when

she wakes up; mild psychomotor retardation; and passive suicidal thoughts. AR431.  Dr. Christopherson referred Ms. Patrick to counseling ("Care Program") and changed her medication regimen to add Prozac in the morning, switch to Rexulti, and taper off Abilify.  AR431.

Ms. Patrick saw Dr. Christopherson on September 29, 2015, and Dr. Christopherson stated under "identifying information" that Ms. Patrick had mood issues, migraine headaches, and chronic pain issues.  AR433. Dr. Christopherson stated in his mental status exam that Ms. Patrick "worries right now that she is going to lose her insurance at the end of the month.  She has fentanyl patches for pain and it does work for her migraines and she won't be able to afford them.  There apparently is no indigent for them.  So I don't know what we are going to do about that. Primary care needs to deal with it." AR433.  Neurological examination showed no new neurological deficit.  AR433. Ms. Patrick also met with Jennifer Enander, BA, CPRP of the Care Program on September 29, 2015, and Ms. Patrick's PHQ9[8] score was 21.[9]  AR434.

Ms. Patrick saw Dr. Christopherson on October 27, 2015, and she reported only one complaint, that her right leg had a little akathisia,[10] which

---

[8] PHQ-9 is a self-administered patient questionnaire that has been shown to be valid for making criteria-based diagnoses of depressive disorders, and a reliable and valid measure of depression severity.  See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/.

[9] PHQ-9 scores range from 0 to 27 with a score of 20-27 indicating severe depression.  See https://www.pcpcc.org/sites/default/files/resources/instructions.pdf at p. 7.

her doctor felt was from switching medications and should clear over time. AR435. She was doing "fairly well" with her mood, but was always having migraines and had chronic pain issues. AR435. Ms. Patrick showed a stable mood and no suicidality. AR435.

Ms. Patrick saw Dr. Christopherson on December 14, 2015, for medication management and complained of restless legs, feeling poorly, having no "get up and go," not wanting to do anything, and akathisia of the lower extremities. AR517. The doctor stated that Ms. Patrick had done better on Abilify before, but previously they had no samples and there was no indigent program for Abilify, but now they had a large supply of 15mg samples and although she had been on a 10mg dose before, these pills could be cut in half and "hopefully 7.5mg will get her by." AR518. Ms. Patrick's PHQ9 score had increased to 25. AR518. Ms. Patrick showed no risk factors for suicide, physical violence, substance abuse or psychosis. AR518.

Ms. Patrick saw Dr. Christopherson on January 12, 2016, for medication management. AR520-21. Ms. Patrick reported that she was a "little stressed" because one of her sons had overdosed. AR521. Ms. Patrick also reported that one of her legs felt jittery due to medication adjustments, which Dr. Christopherson noted should resolve over time. AR521. Ms. Patrick's Klonopin dosage was doubled. AR521. Her PHQ9 score was 23. AR522.

_____

[10] Akathisia is an urge to move that one cannot control and is a common side effect of anti-psychotic drugs. See https://www.webmd.com/schizophrenia/what-is-akathisia.

Ms. Patrick saw Dr. Christopherson on February 16, 2016, and reported tremors and shakiness that began with Rexulti. AR525. Her doctor assured her that her symptoms "would get better" and that "it always gets better," and noted that she did not have "full blown tardive dyskinesia[11] but that is, unfortunately, the direction that she is headed...." AR525. Dr. Christopherson noted that otherwise Ms. Patrick was "actually doing fairly well," and taking vitamin E to help with her symptoms. AR525. Dr. Christopherson stated that he was hopeful that Ms. Patrick's tremors and shakiness would pass within the next six months. AR525.

Ms. Patrick saw social worker Tammy Dramstad for an intake evaluation on March 7, 2016. AR618. Ms. Patrick reported living with her sons, ages 25 and 23, in a mobile home a few lots away from her mother and grandparents and was happy with her current home. AR618. She stated "I have so much anxiety and depression." AR618. Ms. Patrick reported that before June, 2015, she felt more normal, more like herself. AR618. Behavioral observations and examination revealed Ms. Patrick was alert and oriented, had a blunt affect, and described her mood as depressed. AR618. Ms. Patrick also complained of sleep problems, shaky legs, depressed mood, edginess, high anxiety, shortness of breath with anxiety, racing pulse, and feeling a sense of doom with most episodes lasting five to ten minutes. AR619. Ms. Patrick reported that she was

_____

[11] Tardive dyskinesia is a side affect of anti-psychotic drugs that causes stiff, jerky movements of your face and body that you can't control. You might blink your eyes, stick out your tongue or wave your arms without meaning to do so. Not everyone who takes an antipsychotic drug will get it. <u>See</u> https://www.webmd.com/schizophrenia/tardive-dyskinesia#1.

no longer able to cook due to the stress, and her mother cooks for them. AR619. Ms. Patrick reported that in June, 2015, she started crying for no reason and felt quite out of it, was not able to do her job, and started feeling anxious and taking more time off. AR619-20. Ms. Patrick reported she completed only the tenth grade, but obtained a GED. AR619-20. She also claimed that she had a learning disability and struggles to retain information. AR620. Ms. Patrick also reported that she worked for a nursing home and assisted living place and worked for the Center of Independence for 8.5 years and home health for 8 years. AR620. Weekly counseling sessions were planned and psychiatric eligibility findings stated her mental impairments caused a poor employment history, inability to perform basic living skills without assistance, inappropriate social behavior, poor eye contact, and a Global Assessment of Functioning ("GAF") score of 55. AR621-22.

Ms. Patrick saw Dr. Christopherson on March 23, 2016, and reported being overwhelmed at the simplest things and having tremors. AR625. Ms. Patrick stated that her mother started living with her to help care for her. AR625. Examination revealed falls, tremors, and confusion, and her medication was changed to Lamictal. AR625.

Ms. Patrick saw a case manager in her home on March 29, 2016, to help her complete disability forms. AR629. Mental status examination revealed proper alertness, flat affect, anxious mood, appropriate fashion, and fair eye contact. AR629. The case worker observed that Ms. Patrick was organized; was able to answer questions with prompting from her mother; and did very

well, but was slow at times.  AR629.  Ms. Patrick indicated that she seldom

completed tasks around her home and got assistance from her mom and oldest

son.  AR629.  They met again the next day to continue working on the

paperwork and Ms. Patrick's affect was flat and mood anxious.  AR630.  She

continued to need help from her mother answering questions.  AR630.  Her

case manager reported that she "did very well sharing who she is and what she

would like to be in the future," had a really good outlook on life, and that

progress towards her goal was good because she "continues to work on her

disability and seems to be okay with people meeting with her in her home."

AR630.

On April 12, 2016, Ms. Patrick saw her case manager again.  Her mental

status examination revealed that she was alert, had appropriate affect, and

presented herself in appropriate fashion.  AR634.  Ms. Patrick reported to her

caseworker that things went well at her meeting with her lawyer and that she

was pleased with her ability to respond to the lawyer's questions.  AR635.

Ms. Patrick reported that she was doing okay that day but had been anxious

and had struggled over the last week.  AR635.  Ms. Patrick also reported that

she is happy when she gets out of the house and performs tasks and that she

had a very good day and was able to go to her grandmother's and complete

some tasks for her and go out for dinner.  AR635.  She also noted that she is

happy completing tasks that were set out for her by Tammy and that she could

complete them with minimal intervention.  AR635.  She told her case manager

that she would like to exercise more because she knew it would help her pain.  AR635.

Ms. Patrick saw Dr. Christopherson on April 18, 2016, and he felt she looked better, but she reported having a bad day and having a migraine. AR637.  She reported taking the nasal spray form of Imitrex, because she could not afford the pills, and sometimes it worked and sometimes it did not.  AR637. Ms. Patrick continued to complain a lot of jerking and shoulder thrusts and abnormal movements that the doctor felt was associated with neurolyptics.[12] AR637.

Ms. Patrick had additional case management appointments between April 18, 2016, and May 13, 2016.  AR640-46.  Mental status examination revealed that Ms. Patrick was alert and properly oriented; had a cooperative and open attitude; exhibited an affect that varied between blunted, anxious and appropriate and mood that varied between anxious and cheerful; showed good eye contact; and verbalized awareness of problems and consequences in terms of insight. AR640, 642-46.

Ms. Patrick saw Dr. Christopherson on May 3, 2016, and continued to have a high PHQ9 score.  AR648.  Dr. Christopherson noticed "some kind of jerking motion," but the doctor felt she looked a little better.  AR648. Dr. Christopherson noted that Ms. Patrick was able to get out and do things, was exercising "a little bit more," and had plans to eat out for Mother's Day.

_____

[12] Neuroleptic refers to the effects of anti-psychotic drugs on a patient. Neuroleptic drugs may produce a state of apathy, lack of initiative and limited range of emotion.  See medicinenet.com/script/main/art.asp?articlekey=10983

AR648.  Ms. Patrick was trying to obtain disability and Dr. Christopherson

stated, "... it's probably going to be over a year before she gets that.  I do

believe she will get it.  She is certainly not able to work at this time and has

been kind of dysfunctional for some time."  AR48.  Ms. Patrick felt she may

have MS due to her double vision and unsteadiness in her gait but

Dr. Christopherson felt it was caused by her medications.  AR648.

Ms. Patrick had additional case management appointments between May

9, 2016,  and June 2, 2016.  AR650-57.  Mental status examination revealed

that Ms. Patrick was alert and oriented, had a cooperative and open attitude,

exhibited an appropriate affect, had an anxious to cheerful mood, showed good

eye contact, and verbalized awareness of problems and consequences in terms

of insight. AR650-56.  Ms. Patrick's case manager noted that Ms. Patrick did

"very well" filing out her disability paperwork.  AR652.  Ms. Patrick reported

that she was doing well, but had some bad days that she was able to work

through and did very well.  AR654.  During this time, Ms. Patrick was making

meals that her family enjoyed, doing adult coloring, walking three times a

week, going to her cousin's home to visit a newborn baby, caring for her sick

mother, and taking her mother to the emergency room.  AR650-56.

Ms. Patrick saw Dr. Christopher on June 7, 2016.  AR657.

Dr. Christopherson indicated that he thought Ms. Patrick felt "miserable," he

also reported that Ms. Patrick was looking better with improved tremors.

AR657-58.  Dr. Christopherson also reported that Ms. Patrick had been

tending to her "legally blind" mother who had bronchitis and other medical

problems and was helping her elderly grandmother and giving her baths once or twice per week.  AR657.  Ms. Patrick still alleged headaches, but indicated that the headaches were better.  AR657.

Ms. Patrick had additional case management appointments between June 7, 2016, and  July 11, 2016.  AR660-667.  Mental status examination revealed that Ms. Patrick was alert and properly oriented, had a cooperative and open attitude, exhibited an appropriate affect, had an anxious and cheerful mood, showed good eye contact, and verbalized awareness of problems and consequences in terms of insight.  AR660, 663-68.  On June 7, 2016, Ms. Patrick reported that she was doing well.  AR660.  On June 14, 2016, Ms. Patrick reported that she did help her mother cook and she was proud of that.  AR663.  With less headaches and improved moods, on July 5, 2016, she reported that she had been cooking meals for herself.  AR668.  On July 11, 2016, Ms. Patrick reported spending more time on her couch and stated that her mother was preparing more of her meals.  AR669.  On July 11, 2016, Ms. Patrick also reported that she felt she may be slipping further into depression again.  AR669.

Ms. Patrick saw Dr. Christopherson again on July 20, 2016, and he stated in his mental status examination that she was not doing well and had markedly declined, was unable to do the simplest things like making canned soup, and just wanted to sit on the couch and isolate.  AR674.  Her anti-psychotic medication had been stopped due to side effects, and her Prozac dosage was increased, and Zyprexa and Concerta prescribed.  AR674.

Ms. Patrick saw a case worker on July 20, 2016, to get help with public assistance for her medications. AR672. The case worker found Ms. Patrick's mental status to show that Ms. Patrick was well oriented in all spheres and alert. AR672.

On August 2, 2016, when Dr. Christopherson saw Ms. Patrick, he stated in his mental status exam that it looked like Ms. Patrick was having a good day versus a bad day and noted that things were better after Ms. Patrick started the medication Concerta. AR681. She tolerated the mediation without difficulty and admitted to doing more. AR681. Her Concerta dosage was increased. AR681.

Ms. Patrick saw a case worker on August 2, 2016, to review her medications and the case worker stated Ms. Patrick's mental status showed proper alertness, appropriate affect, cheerful mood and appropriate fashion. AR683-84.

During her therapy visits with her case manager in August, Ms. Patrick reported that despite having some days she struggled she was able to babysit her cousin's children, help her grandmother, go shopping on her own, volunteer at the animal shelter, and do "very well" in public. AR691-93. Ms. Patrick also reported that she felt she successfully handled her rising anxiety when her mother was out of the home for five hours one day. AR692.

Dr. Christopherson saw Ms. Patrick on September 6, 2016, and stated in his mental status examination that she was worse, with lots of chronic physical

aches and Prozac and Concerta were stopped, Fetzima was added, and Focalin was started after indigent approval. AR708.

Ms. Patrick saw a case worker on September 6, 2016, to work on rapport-building and symptom assessment. The case worker stated Ms. Patrick's mental status showed that Ms. Patrick was well oriented in all spheres and alert with appropriate affect, anxious mood, and appropriate fashion. AR705-06.

Mental status examinations from Ms. Patrick's September, 2016, case management appointments showed that Ms. Patrick was alert, appeared in appropriate fashion, had logical and coherent speech, exhibited fair to good judgment, had good eye contact, had bland affect at times, had mood that at times was depressed, somber or empty and could attend and maintain focus. AR711, 714-40. Ms. Patrick reported on September 22, 2016, that she was going to Walmart a few times and trying to get out and do things, and had a lot of paperwork to get done for her sons but was able to get help from her uncle, and she was feeling more depressed. AR730. Ms. Patrick also reported that she often walks, plays cards, listens to music, and spends time with family. AR734. Ms. Patrick also shared about her struggles with depression and discussed coping skills to help with her depressive symptoms. AR734. On September 29, 2016, Ms. Patrick stated that she had a "great day" and was planning to attend a food drive with her mother and son. AR739. She also noted that she was taking walks, losing weight, and working through her anxiety and depression. AR739.

On October 4, 2016, Ms. Patrick reported to her case manager that she met with the staff at Salvation Army to request financial assistance. AR745. Ms. Patrick was able to review the documentation needed for this process. AR745. On October 6, 2016, Ms. Patrick reported to her case manager that she was taking her son to the dentist and running other errands. AR748.

Ms. Patrick saw Dr. Christopherson on October 12, 2016, and reported that she stopped the Fetzima because "it upset her stomach and did [not] do her any good," so Pristiq was prescribed. AR756. Dr. Christopherson noted that Ms. Patrick had not heard much from disability and stated, "... she should certainly qualify for that." AR756.

Case workers found that Ms. Patrick's mental status between October 12, 2016, and October 29, 2016, showed proper orientation and alertness, appropriate fashion, good eye contact, open and cooperative attitude, appropriate to bland affect and ability to attend and maintain focus, anxious to depressed mood, and fair to good judgment. AR759-82.

Dr. Christopherson saw Ms. Patrick on October 31, 2016, for medication management and noted that Ms. Patrick was tolerating her medication adjustment well and that she was in the process of moving into a new apartment. AR785. Dr. Christopherson noted that Ms. Patrick looked "pretty good." AR785.

On November 2 and 3, 2016, Ms. Patrick reported to her case manager that she was actively working on packing and moving into her new apartment.

AR791-92.  Ms. Patrick also noted that her anxiety was controlled with

Klonopin and denied any side effects from medication.  AR791.

In November 2016, Ms. Patrick told her case manager that she had

cleaned her old trailer to get back the deposit, and planned to "take a day off"

of cleaning to rest, and went to social outings such as going to the movie

theater with her son.  AR802, 805.  Ms. Patrick stated she enjoyed getting out

to the movie "cuz it's been awhile."  AR806.  When asked about anxiety at the

movie Ms. Patrick reported there weren't many people at the movie so that

helped.  AR806.  Ms. Patrick also reported that she was planning to have

Thanksgiving at her new apartment with her family, and attend a bake sale

and free food giveaway, and on November 23, 2016, she reported her mother

was over that day to help with dinner prep for the Thanksgiving meal.  AR810,

817.  On November 26, 2016, Ms. Patrick met with her case manager at a

coffee shop and talked about her Thanksgiving and decorating for Christmas.

AR820.  Ms. Patrick also noted that her hobbies included riding motorcycles.

AR820.  Ms. Patrick's case manager noted that progress towards her goals was

high because she was able to go on community outings with staff and had

better control of her anxiety.  AR820.  Ms. Patrick also reported that she was

feeling somewhat anxious and depressed that day.  AR820.

On December 2, 2016, Ms. Patrick appeared positive, open and

cooperative with her case manager.  AR827.  Her case manager reported that

Ms. Patrick was doing well and happily showed the staff her decorated

apartment.  AR827.  Ms. Patrick also visited several stores, ran errands in the

community, went to Salvation Army for a food basket, baked cookies, and planned to attend a church concert. AR827, 830. Ms. Patrick also noted that she went to her uncle's medical appointment and a crowded store; and although she had increased anxiety, she used coping techniques. AR847, 861.

Ms. Patrick saw Dr. Christopherson on January 11, 2017. AR872-73. Dr. Christopherson noted that he had not seen Ms. Patrick since October and was not sure about all that had happened. AR872. Dr. Christopherson stated in his mental status exam that Ms. Patrick continued to struggle, complained of increased depression, feeling depressed, helpless and hopeless. AR872. Her Pristiq dosage was increased. AR872. Ms. Patrick's PHQ9 score was 24. AR873.

Ms. Patrick saw a case worker on January 11, 2017, to fill her weekly planner and the case worker stated Ms. Patrick's mental status showed that she appeared her stated age, presented herself in appropriate fashion, and had ability to attend and maintain focus. AR870.

In addition to treatment by Dr. Christopherson, Ms. Patrick received multiple forms of care or caseworker assistance with many issues such as counseling, coping, financial assistance indigent drug program assistance, assistance with disability forms and others. AR618-889, 898-962, 1108-1296. She received that type of assistance multiple times per month. Id.

On January 18, 2017, Dr. Christopherson completed a detailed mental impairment questionnaire with a combination of handwritten and check-the-box responses regarding Ms. Patrick's ability to do "work-related activities on a

day-to-day basis in a regular work setting." AR612-17. Dr. Christopherson assessed Ms. Patrick's GAF at 35, and noted that Ms. Patrick was in their Impact program, which is designed for people needing lots of assistance and therapy. AR612. He described Ms. Patrick as very hopeless, helpless, anxious and had become quite dysfunctional overall. AR612. He identified Ms. Patrick's symptoms to include loss of interest, weight change, feelings of worthlessness, thoughts of suicide, persistent anxiety, difficulty concentrating, psychomotor agitation, motor tension, persistent mood disturbance, personality change, paranoid thinking, isolation, vigilance sleep disturbance, and recurrent panic attacks. AR613.

Dr. Christopherson opined that Ms. Patrick was seriously limited or unable to meet competitive standards in every ability or aptitude required for work activities on a day-to-day basis in a regular work setting. AR614-15. The form defined seriously limited to mean having noticeable difficulty 11-20% of each workday or week, and unable to meet competitive standards as having noticeable difficulty 21-40% of each workday or week. AR614. Dr. Christopherson explained, "Clearly doesn't function well without some assistance – she had been fairly functional some time ago, worked with developmentally delayed and this physician had known her in that capacity. There is no way she could do a job now." AR614. On January 18, 2017, Dr. Christopherson also stated that if Ms. Patrick attempted work he would anticipate she would be absent more than four days per month. AR617.

On January 30, 2017, and January 31, 2017, Ms. Patrick had case management appointments. AR899-900. Case workers stated that Ms. Patrick's mental status showed alert consciousness, proper orientation, appropriate affect, anxious mood, appropriate fashion, fair eye contact, open and cooperative attitude, and good judgment. AR899-900. The case manager noted that Ms. Patrick was able to share what parenting strategies she was using and problem solving new strategies. AR899-900.

On February 1, 2017, Ms. Patrick's case manager noted that effectiveness of intervention was good because she could fill her medication planner without any assistance, denied any side effects and had no concerns related to her appetite or sleep. AR902.

At Ms. Patrick's February 2, 2017, and February 3, 2017, case management appointments, caseworkers stated that Ms. Patrick's mental status showed appropriate affect, appropriate fashion, good eye contact, open and cooperative attitude, insight of having awareness of problems, and ability to attend and maintain focus. AR903-04.

Ms. Patrick saw Dr. Christopherson on February 8, 2017, and was stressed due to her youngest son, who was fathered by her ex-husband who ultimately committed suicide, being committed for a five-day hold at HSC. AR911.

Ms. Patrick met with a case worker on February 8, 2017, to fill her weekly medication planner and get assistance with a treadmill, and the case worker stated Ms. Patrick's mental status showed Ms. Patrick appeared her

38

stated age, had appropriate fashion, and could attend and maintain focus. AR909.

Daily case management appointments between February 9, 2017, and March 8, 2017, showed that Ms. Patrick had proper orientation; appropriate to bland affect; cheerful, depressed or anxious mood; appropriate fashion; fair to good eye contact; open and cooperative attitude; good insight; and awareness of problems. AR915-45. She noted that she was "feeling better," had a "busy day of errands," went to a food give away, and traveled to Yankton to visit her son. AR915-16; 921. Ms. Patrick indicated that she felt increased anxiety from concerns about her son, Ms. Patrick also employed coping techniques and had decreased symptoms once her son's situation started to improve. AR916, 934. On occasion, Ms. Patrick was able to manage her anxiety in public. AR927, 931, 940. On March 3, 2017, Ms. Patrick noted she had been successful with managing stress/anxiety as of late as she often listens to music and walks on her treadmill. AR938. Ms. Patrick also discussed her concerns with headaches and planned to receive injections that afternoon that would hopefully reduce her headaches. AR938.

Ms. Patrick saw Dr. Christopherson on March 8, 2017, and was described as having a severe episode of depression which had gone on for over two years and "She is unable to work and is markedly stressed." AR946.

Dr. Christopherson stated in his mental status examination that Ms. Patrick continued to "awfulize" everything in the world, but that she was receiving therapy and working "DBT."[13] AR946. Dr. Christopherson noted that Ms. Patrick had a serious traumatizing marriage with her husband's mental illness and suicide, but did not think she was ready for EMDR.[14] AR946. Ms. Patrick's Klonopin dosage was adjusted. AR946.

Daily therapy appointments with her case manager between March 9, 2017, and May 10, 2017, showed proper orientation; varied affect from appropriate to flat or blunted; appropriate fashion; fair to good eye contact; open and cooperative attitude; insight into awareness of problems; and good judgment. AR950-61, 1109-74. Ms. Patrick's caseworker noted that Ms. Patrick was able to complete all the paperwork necessary to obtain indigent medication insurance, respond to all questions appropriately on a survey with providing explanations for her responses, and fill out her weekly planner without any problems. AR950, 958-59.

Ms. Patrick saw Dr. Christopherson on May 10, 2017, and was described as being a little bit more in control. AR1175. Examination revealed she was doing quite well, the doctor said it was the best he had seen her in several

---

[13] A possible reference to dialectical behavior therapy, a type of cognitive behavioral therapy.

[14] Eye Movement Desensitization and Reprocessing, a psychotherapy treatment used for treatment of post-traumatic stress disorder, depression, and anxiety, among other things. It uses the patient's own rapid eye movements to decrease the negative effect of certain thoughts, images or memories. See webmd.com/mental-health/emdr-what-is-it#1.

months and stated, "I think she's on good behavior because her behavior was a little bit off the last time I saw her." AR1175.

Daily therapy appointments occurred with her case manager between May 11, 2017, and June 21, 2017, and she showed proper orientation; fair to good eye contact; open and cooperative attitude; insight into awareness of problems; good judgment; and ability to attend and maintain focus. AR1179-1226. During this time, Ms. Patrick cooked different recipes, cooked nearly every day with help from her mother, hosted guests over a long weekend, did "a lot" of cleaning, and threw a party for her uncle. AR1179, 1184, 1186-87, 1194-99, 1206, 1211-12, 1214, 1217-18, 1222-23 1226. Ms. Patrick also reported that she had a "wonderful" Mother's Day with her family, which helped improve her mood and anxiety. AR1185. Ms. Patrick noted she was "doing well," exercising, running errands, going to the grocery store, and going to food giveaways. AR1188-89, 1193, 1203, 1212, 1214. On June 8, 2017, Ms. Patrick reported that she had a migraine, but was very busy the day before cleaning out three cars and thought she overdid it in the heat. AR1211.

On June 22, 2017, Ms. Patrick demonstrated an appropriate affect and cheerful mood at her case management appointment but complained that she was sleeping a lot and did not have the motivation to walk on the treadmill. AR1227. However, she noted that she had a good time with her family on Father's Day, cooked enchiladas and rice, and baked a cake. AR1227.

On June 24, 2017, Ms. Patrick took 16 Excedrin migraine pills in an attempt to harm herself. AR1066. She reported that she had never made a

suicide attempt in the past.  AR1066.  She called her case manager and poison control about her actions, and went to the emergency room.  AR1066, 1076, 1232.  Ms. Patrick stated that she wanted to sleep and not wake up.  AR1232.  Ms. Patrick indicated that she felt like things had gotten worse over the last couple of weeks, which may have been due to the increase in the fentanyl patch.  AR1233.  The emergency room record noted Ms. Patrick's chronic spine pain and history of arthritis.  AR1067.  Neurological and psychological examination showed that Ms. Patrick was properly oriented and had reflexes, motor function, sensation, mood and affect within normal limits.  AR1070.  Additionally, Ms. Patrick's back, neck and extremities were within normal limits.  AR1070-71.  Ms. Patrick was discharged from the emergency room the same date.  AR1078.

On June 26, 2017, Ms. Patrick returned to the emergency room for a screening for an involuntary commitment.  AR1089, 1098.  Emergency room examination revealed depressed mood and affect, but proper orientation.  AR1093.  Case management therapy records from that date indicated that Ms. Patrick had appropriate affect and expansive mood, but her judgment was poor as she verbalized complete denial of her problems.  AR1098, 1234.  Her case manager completed a petition of emergency commitment and arranged transport to HSC for treatment.  AR1234.

On July 7, 2017, Ms. Patrick returned from HSC and saw her case manager.  AR1238.  Ms. Patrick was in good spirits and reported being happy

to be back home with her family. AR1238. Mental status examination revealed appropriate affect, appropriate fashion, and good eye contact. AR1238.

Ms. Patrick was seen for Impact case management on July 9, 2017, after returning home from HSC and her mood was anxious and attitude was indifferent. AR1239. Ms. Patrick was quiet but did respond to questions. AR1239. She reported no concerns other than her back pain. AR1240.

Case management therapy notes from July 10, 2017, and July 11, 2017, showed that Ms. Patrick was alert and had an appropriate affect, euthymic mood, fair to good eye contact, animated speech, partial awareness of problems, and fair judgment. AR1240-42. Ms. Patrick also reported she felt like her recent hospitalization was effective for her as she was off of pain medications and reported she was doing better. AR1241. Ms. Patrick also noted she was in good spirits and feeling well. AR1240-42. She reported cooking chili and exercising again. AR1242.

Ms. Patrick saw Dr. Christopherson on July 12, 2017, and stated she seemed to be doing remarkably well since returning from HSC. AR1243. Ms. Patrick had been taken off narcotics at HSC, and no medication changes were made. AR1243. Ms. Patrick's PHQ9 score was 24 at baseline. AR1244. Ms. Patrick reported that she was taking her morning medication with no concerns. AR1246.

On July 13, 2017, Ms. Patrick was seen by a case worker in her home and the case worker stated Ms. Patrick's mental status showed she was alert, had an open and cooperative attitude and was able to attend and maintain

focus.  AR1248-49.  Ms. Patrick reported to her case manager that she and her mother were cooking a recipe together.  AR1249.

Ms. Patrick was seen on July 14, 2017, for Impact case management and reported going for a walk and stopping after 20 minutes due to back pain. AR1250.  The case worker stated Ms. Patrick's mental status showed she was alert, had open and cooperative attitude, and had an ability to attend and maintain focus.  AR1249.  Ms. Patrick was seen on July 15, 2017, for Impact case management and reported feeling well today, but having a little back pain. AR1251.  The case worker stated Ms. Patrick's mental status showed she had appropriate affect, appropriate fashion, and good eye contact.  AR1251.

Ms. Patrick was seen on July 16, 2017, for Impact case management and reported she was struggling to deal with her back pain, but was going to make a meal later in the week.  AR1252.  On July 17, 2017, Ms. Patrick had a euthymic mood and baked tacos for her children.  AR1253.  The case worker stated her mental status showed Ms. Patrick had fair eye contact, animated speech, partial awareness of her problems and fair judgment.  AR1253.

Ms. Patrick was seen on July 19, 2017, for Impact case management and reported she was still walking on her treadmill even with her pain.  AR1255. Ms. Patrick's case manager also noted the effectiveness of the intervention was high as Ms. Patrick took her medications and was able to fill out her medication planner with no concerns.  AR1255.  The case worker stated Ms. Patrick's mental status showed she was averting eye contact.  AR1255.

Ms. Patrick was seen on July 20, 2017, for Impact case management and the case worker stated Ms. Patrick's mental status showed appropriate fashion, good eye contact, bland affect, limited speech, open and cooperative attitude, and insight into awareness of problems. AR1257. The session effectiveness was only mild as Ms. Patrick reported that since her return from HSC she had been ill or feeling pain in her back. AR1257. On July 21, 2017, Ms. Patrick reported feeling better after starting new antibiotics. AR1258. Ms. Patrick also discussed her plans to spend time with family and walk 20 to 30 minutes a day. AR1258. On July 22, 2017, Ms. Patrick reported having a little back pain and reported that she was feeling well and planned to walk on the treadmill later that day. AR1259.

At Ms. Patrick's July 24, 2017, case management appointment the case worker stated Ms. Patrick's mental status showed she had an appropriate affect, euthymic mood, fair eye contact and judgment, animated speech, partial awareness of her problems and fair judgment. AR1262. Ms. Patrick's case manager documented that Ms. Patrick had clear thought processes, reported no thoughts of suicide, and was off any pain medications. AR1262. Ms. Patrick again mentioned her back pain at another session on July 25, 2017, but noted that she was feeling well and in good spirits. AR1263.

Ms. Patrick continued daily case management appointments through the rest of July and reported her back sometimes hurt and she was cooking various meals. AR1264-68. On August 1, 2017, at another session,

Ms. Patrick reported Mobic had been prescribed and her back pain had decreased. AR1270. At another session on August 6, 2017, Ms. Patrick reported she had a good day at her grandmother's the day before but was currently having more back pain. AR1276.

At Ms. Patrick's August 7, 2017, case management appointment, Ms. Patrick reported she had no thoughts of harm to herself and others and had an improved mood after being taken off all narcotics. AR1277. Ms. Patrick noted she has been playing cards with her family again and received approval from her landlord for another pet cat. AR1277. On August 8, 2017, Ms. Patrick reported that her back pain had decreased and that she planned to walk on her treadmill. AR1278. The case worker stated Ms. Patrick's mental status showed she had fair eye contact, animated speech, mildly impaired recent memory, and fair judgment. AR1277.

Ms. Patrick saw Dr. Christopherson on August 9, 2017, and her psychiatric medications included Topamax, olanzapine, Remeron and Prozac. AR1280. Her PHQ9 score was 27 with suicidality at zero, which Dr. Christopherson described as "very much status quo." AR1280. He stated her medications did not need to be changed; she is as stable as she gets. AR1280. Her diagnoses included major depressive disorder, recurrent, moderate; other specified obsessive-compulsive disorder; dysthymic disorder; and personality disorder. AR1280.

Case management appointments between August 10, 2017, and August 18, 2017, show that Ms. Patrick was alert, properly oriented, open, cooperative,

sometimes indifferent and able to attend and maintain focus. AR1285-96. Effectiveness of intervention was positive, as Ms. Patrick had no concerns about her medications and showed no symptoms. AR1285, 1295. Ms. Patrick also reported she was walking daily, spending time with her family, shopping with her sons, cooking different meals, and caring for a new kitten. AR1285, 1291-95. On August 3, 2017, her mood was anxious and eye contact fair (AR1289), on August 14, 2017, her affect was blunt, eye contact fair, speech animated, recent memory impaired (AR1290), and on August 16, 2017, her affect was bland. AR1292.

Following the ALJ's denial, Dr. Christopherson submitted a letter dated February 7, 2018. Dr. Christopherson emphasized in the letter that his relationship with Ms. Patrick included not only treating her the last two years, but before that time he was involved in treatment of her children. AR22. Based on those interactions he was aware of her "having a pretty significant decline which she became unable to work." AR22. Dr. Christopherson also stated that when a patient has something positive happen in their life despite their problems it is noted in the treatment record that they had some appropriate positive response, but it "does not imply that they do not suffer from depression or severe mental illness." AR22. Dr. Christopherson specifically stated in reference to the ALJ's comment about eye contact and what it implied, that it was something he seldom, if ever, put in his notes in general, and if he did he did not put much weight in it anyway. AR22.

Dr. Christopherson stated he did not feel Ms. Patrick could return to anything close to as functional a job as she had in the past, and noted she struggled with basic things in life, even with support from her mother and even her children.  AR23.  He stated he did not believe he overjudged or painted an untrue picture of Ms. Patrick's ability to function and she "would struggle returning to any type of employment at this juncture."  AR22.

Dr. Christopherson concluded, "Therefore, I believe she is in fact disabled and it would be very difficult for her to work any meaningful job on a long-term basis and support herself."  AR23.

### 3.    Chiropractic Treatment Records

Ms. Patrick was seen for chiropractic treatment on her back from November 14, 2013, through April 9, 2014, at Pro PT.  AR341-385.

Ms. Patrick was seen for chiropractic treatment on her neck and back periodically from June 13, 2009, through November 14, 2016, at Delzer Chiropractic.  AR531-573.

### 4.    South Dakota Human Services Center (HSC), Yankton, SD

Ms. Patrick was admitted on an involuntary five day emergency hold at HSC on June 27, 2017.  AR964.  At admission examination revealed complaints of photophobia, appeared somewhat disheveled, quite lethargic, psychomotor retardation, slightly slowed and quiet speech, restricted affect, dysphoric mood, no flight of ideas, some thought blocking may be present, no paranoia or delusional statements, alert and oriented, and her insight and judgment were impaired.  AR1040-41.  The doctor observed that Ms. Patrick's

48

comorbid chronic pain issues significantly impacted her emotional well-being. AR1041.

On June 28, 2017, the record noted that Ms. Patrick complained frequently of back pain, fibromyalgia pain and migraines. AR1044. Ms. Patrick was discharged on July 7, 2017. AR1064. Ms. Patrick's pain patches and pain mediations were stopped and Ms. Patrick was upset by that, but did not have bad or suicidal thoughts at discharge. AR1064.

### 5. State Agency Assessments

The state agency physician consultant at the initial level on December 18, 2015, found Ms. Patrick had severe medically determinable impairments of migraines, spine disorder and fibromyalgia. AR95. The consultant found Ms. Patrick was capable of light exertion work with postural limitations of occasional stooping, kneeling, crouching and crawling. AR97. The consultant stated there was no medical or other opinion evidence in the record. AR96. The state agency physician consultant at the reconsideration level on March 9, 2016, made the same findings, including the severe medically determinable impairments of spine disorders. AR115, 117-18. The reconsideration level consultant also stated there was no medical or other opinion evidence in the record. AR117. Both consultants stated the limitations were due to fibromyalgia and back pain. AR97, 118.

The state agency psychological consultant at the initial level on December 18, 2015, found Ms. Patrick had medically determinable impairments of anxiety disorder and affective disorder, which caused mild

functional limitations in ADLs, social functioning, and in maintaining concentration, persistence, or pace, so they were found non severe. AR95. The state agency expert at the reconsideration level made similar findings on March 11, 2016. AR115-16. The consultants at both levels stated there was no medical or other opinion evidence in the file at the time of their assessments. AR96, 117.

**D.      Testimony at the ALJ Hearing**

**1.      Ms. Patrick's Testimony**

Ms. Patrick testified that her sons, ages 24 and 27, both lived with her and were both disabled due to mental illness. AR52. She testified she did not take them to appointments. AR73. Ms. Patrick testified her mother helped with cooking, her son vacuums and changes the litter box. AR74.

Ms. Patrick testified she had comprehension problems reading and a learning disability. AR54. She said she could not look up a number in a phone book very well. AR54. Ms. Patrick testified she also could not do basic math like adding and subtracting very well. AR54. Ms. Patrick testified that she last worked in September, 2015, and had been calling in sick a lot, and her depression and anxiety got bad and she could not do her job duties and quit. AR55. Ms. Patrick testified she had no health insurance, not even Medicaid. AR56.

Ms. Patrick testified her depression and anxiety caused problems with concentration, memory, being around crowds, and she gets paranoid. AR57. Ms. Patrick testified she saw someone from the Impact program every day to

give her medications and talk to her.  AR66.  She also received weekly counseling sessions, and saw her psychiatrist about once a month.  AR69-70.

Ms. Patrick testified she gets migraines two to three times per week sometimes more often.  AR57-58.  She said they cause aching and throbbing pain and the pain is typically 7/10.  AR58.  She testified she takes Topamax daily for the headaches and Imitrex nose spray when needed.  AR59. Ms. Patrick said she also received shots from her doctor when the migraine is really bad or lasting longer.  AR59.

Ms. Patrick testified she was diagnosed with fibromyalgia after she had a hysterectomy.  AR60.  She said her family doctor diagnosed the fibromyalgia, but she had been to a rheumatologist in Sioux Falls who confirmed it.  AR60. Ms. Patrick said she had burning pain, aches all over and it was constant with varied intensity.  AR61.  She said she took Lyrica for fibromyalgia and had received injections.  AR62.

Ms. Patrick testified she had back pain and when she had insurance she had received epidural injections and had physical therapy.  AR62-64.  She said her back pain was worse when standing very long or bending and when doing things like cooking or laundry she needed to sit down and take breaks.  AR64.

Ms. Patrick testified when she was in the HSC they had taken her off some of her medications and she had just got put back on them on Friday. AR65.  The ALJ made Ms. Patrick leave the hearing room during her mother's testimony.  AR77, 84.

### 2. Ms. Patrick's Mother's Testimony

Ms. Patrick's mother testified she tried to motivate Ms. Patrick daily and if left alone she would stay in bed or on the couch all day. AR79. She said Ms. Patrick was very depressed, had difficulty going places, hides or drops her head, thinks people are looking at her and does not smile anymore. AR80. Ms. Patrick's mother testified she felt Ms. Patrick was overmedicated and had hoped it would make a difference when HSC reduced her medications but she never bounced back, she was still down, still depressed and anxious. AR82.

### 3. Vocational Expert Testimony:

The ALJ asked the VE a hypothetical that incorporated the limitations identified in the RFC noted in the ALJ's decision and told the VE past work would be excluded, and asked the VE if there would be other work. AR85-86. The VE testified the person could perform the occupations of document scanner, DOT# 207.685-018; laundry worker, DOT# 361.687-014; and routing clerk, DOT# 222.587-038, and provided the number of jobs available nationally for each. AR87. The VE testified his answers were consistent with the DOT. AR87. The VE testified an individual would be unemployable if they were absent more than two days per month, or unable to concentrate for two-hour segments, or unable to sustain an ordinary routine without special supervision. AR87-88.

**E.     Disputed Facts**

The plaintiff proposed the following facts and the defendant objected to them.

1.     At Step Two, the ALJ did not mention Ms. Patrick's allegations of back or right shoulder problems.  AR32-33.

2.     At Step Three, the ALJ did not mention Ms. Patrick's severe fibromyalgia or make a finding equivalency pursuant to SSR 12-2p, or mention Listing 12.08 related to Ms. Patrick's severe personality disorder.  AR32-34.

## DISCUSSION

**A.     Standard of Review**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[15]  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One**:  Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821

---

[15] Although Ms. Patrick has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the Title XVI regulation is identical.  It is understood that the provisions of both Titles are applicable to Ms. Patrick's application. Any divergence between the regulations for either Title will be noted.

(8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof

shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); <u>Clark v. Shalala</u>, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." <u>Brown v. Apfel</u>, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." <u>Walker v. Bowen</u>, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004).

## D.     The Parties' Positions

Ms. Patrick alleges the Commissioner erred at every single step of the five-step analysis except for step one. She asks the court to reverse and remand for an award of benefits or, alternately, to remand for further development of the record. The Commissioner asserts his decision is supported at all steps by substantial evidence in the record and asks the court to affirm his decision.

## E.     Step Two

Ms. Patrick alleges the Commissioner erred by not including her back and right shoulder condition as a severe medically determinable impairment at step two.[16] <u>See</u> AR32. The ALJ failed to consider the back impairment, despite

---

[16] Ms. Patrick includes her right shoulder in this argument, but never supports the conclusion that this was a severe impairment. It was not. Medical records show she only complained of and sought treatment for her shoulder for a two-month period during February to April, 2016. <u>See</u> AR509, 600-01, 603, 606, 609.

two state agency opinions that the condition was medically determinable and was severe.  <u>Compare</u> AR32 (ALJ opinion), <u>with</u> AR95, 115 (state agency physicians' opinions).  On appeal to the Appeals Council, the Council agreed the ALJ should have considered the back condition (AR5, 11), but the Council held the condition was either not medically determinable, or alternatively, that the impairment was nonsevere and, therefore, no limitations in RFC should be attributed to Ms. Patrick's back condition.  AR12.

At step two, it is the claimant's burden to demonstrate a (1) severe (2) medically determinable impairment, but the burden is not difficult to meet and any doubt about whether the claimant met her burden is resolved in favor of the claimant.  <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007); <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001); <u>Quinn v. Berryhill</u>, 2018 WL 1401807 *5 (D.S.D. Mar. 20, 2018); and <u>Dewald v. Astrue</u>, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)).

An impairment is "medically determinable" if it results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  <u>See</u> 20 C.F.R. § 404.1521.  "Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."  <u>Id.</u>  If an impairment is medically determinable, then the Commissioner next considers whether it is severe.  <u>Id.</u>

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.[17]  See 20 C.F.R. § 404.1522(a).  Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).  At step two only medical evidence is evaluated to assess the effects of an impairment on the ability to perform basic work activities.  See SSR 85-28.  Therefore, subjective complaints by the claimant are not part of the step two analysis.  Id.

Ms. Patrick points to the ample evidence in the record of the various and substantial *treatments* Ms. Patrick received for her back impairment.  These included a long-term prescription for a fentanyl patch, long-term opiate prescriptions, multiple epidural injections over a long period of time, multiple intramuscular steroid injections, and chiropractic care. AR341-85, 386, 388, 391, 425, 439, 441, 443-44, 453, 456-57, 459, 465, 468-69, 482-83, 485-86, 488-89, 492, 494-95, 497-98, 509-10, 531-73, 582-84, 588, 591, 594-95, 597-99, 610, 890, 894, 1299, 1301.  This treatment covered the period from

_____

[17] Paradoxically, the Commissioner's regulations do not define "severe," but rather define what is "not severe."  The inference from the regulation is that a severe impairment *does* significantly limit a claimant's physical or mental ability to do basic work activities.

September, 2014, to August, 2017. About the only medical treatment Ms. Patrick did not receive was surgery.

Of course, *treatments* are not "medical determinations," which are defined as "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." <u>See</u> 20 C.F.R. § 404.1521. Rather, they are circumstantial evidence that Ms. Patrick's care givers *believed she had* a medically determinable back impairment. Ms. Patrick's argument infers such serious treatment modalities as were given to Ms. Patrick would not have been prescribed in the absence of a medically determinable condition. The circumstantial evidence of the impairment was sufficient to cause two state agency physicians to agree that Ms. Patrick had a medically determinable back impairment. AR95, 115.

If the record was lacking in the actual direct evidence of the medical determinability of her impairment, as Ms. Patrick points out, her medical records contained multiple references to an MRI of her back that had been taken some time before the earliest medical record in the AR in September, 2014. <u>See, e.g.</u> AR471-72, 474-75, 477, 482, 485-86, 488-89, 494, 497. Ms. Patrick argues it was incumbent upon the Commissioner, if it harbored any doubts about the medical determinability of Ms. Patrick's back impairment, to request this MRI. The court agrees.

Disability proceedings are nonadversarial and the Commissioner has a duty to develop the record even if a claimant is represented by counsel.

Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010); Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004).  If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification.  McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  However, this is true only for "crucial" issues.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Here, there was ample circumstantial evidence Ms. Patrick's back impairment was medically determinable based on the constant and serious treatment modalities she consistently received in the three years' worth of records in the AR.  If the Commissioner had any doubts about medical determinability of the back impairment, it should have requested the MRI of Ms. Patrick's back that was repeatedly referenced in her spinal treatment records.  The Commissioner in this appeal acknowledges it would be important to know when the MRI was taken and what abnormalities it established or did not establish.  See Docket No. 21 at p. 6.  This court agrees.[18]

The second part of her burden at step two requires that Ms. Patrick demonstrate her medically determinable back impairment was "severe."  Again, the two state agency physicians found Ms. Patrick's back impairment to be severe based on the records in the AR.  AR95, 115.  These are the only medical opinions in the record concerning Ms. Patrick's back impairment.  Ms. Patrick

---

[18] The court also notes Ms. Patrick never obtained the MRI herself and attempted to introduce it as new and material evidence, either before the Appeals Council or before this court though there is established precedent for doing so.

also supplied her own testimony as to the severity of her back impairment in both her oral testimony before the ALJ and in her answers to disability and function questionnaires.  See AR64, 243-60, 263-70, 273-80.

The Appeals Council's rationale for holding that Ms. Patrick's back condition was not severe was that she had had that condition for most of her life and, yet, was able to work at the substantial gainful activity level for her entire adult life.  AR11-12.  The Appeals Council stated there was no evidence to show Ms. Patrick's back condition had ever worsened.  Id. (citing Ex. 7F at p. 43).  The very document the Appeals Council cited to shows Ms. Patrick suffered from a bad back her whole life *also* evidenced a sudden worsening of that pain in 2009.  AR573 (Exhibit 7F at p. 43).  The rationale of the Appeals Counsel concluding Ms. Patrick's back condition was not severe is fatally flawed.  The court finds the Commissioner erred in determining Ms. Patrick's back impairment was nonsevere.

The next question presented is whether this step two error requires reversal, or whether it is harmless error.  District courts within the Eighth Circuit have differed in their opinion as to whether a mistake at step two is harmless—or reversible—error.  In Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), the ALJ failed to identify at step two the severe impairment of borderline intellectual functioning.  Nicola, 480 F.3d at 887.  The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe.  Id.  The court held the ALJ's failure to identify the impairment as severe was not harmless error.  Id.  The court

reversed and remanded the case to the commissioner for further proceedings. Id.

Following Nicola, some courts have reversed on step two errors. Quinn, 2018 WL 1401807 at *6. Others have found step two errors to be harmless. Lund v. Colvin, 2014 WL 1153508 at *26 (D. Minn. Mar. 21, 2014) (collecting cases). The central theme in the cases which hold reversal is not required is that "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC." Id.

This court declines to attribute a *per se* rule to the Nicola holding. Rather, reversal is required where there was a mistake at step two which impacts the RFC formulation at step four. Where the limitations from the omitted impairment are *not* factored into the RFC at step four, reversal is required. If the impairment was omitted at step two but the limitations from the impairment *were* incorporated into the claimant's RFC at step four, then reversal is not required.

Here, the ALJ omitted Ms. Patrick's back impairment at step two (AR32), but arguably included limitations in her RFC at step four which are attributable to the back impairment (AR34-35). However, the Appeals Council then reversed the ALJ and held that no limitations should be incorporated into Ms. Patrick's RFC on account of her back condition because that condition was not medically determinable and not severe. AR5, 11-12. This clouds the issue of what, exactly, the final decision of the Commissioner is regarding Ms. Patrick's RFC.

The court assumes, for purposes of this opinion, that Ms. Patrick demonstrated her back impairment was a severe, medically determinable impairment at step two and that the ALJ and Appeals Council erred in not including that impairment at step two. Whether this was reversible error or harmless error is discussed at the court's step four analysis below.

**F.    Step Three**

Ms. Patrick alleges the ALJ erred at step three of the analysis by failing to consider her fibromyalgia (FM), her migraines, and the specific Listing for personality disorder, 12.08. If a claimant has an impairment which "meets or equals" a Listing, the claimant is disabled. 20 C.F.R. § 404.1520(d). The Listings describe various physical and mental impairments categorized by the body system they affect. 20 C.F.R. § 404.1525. If the claimant has one of the listed impairments, the step three analysis consists in comparing the findings of the claimant's impairment with the Listing. Id. If the claimant's findings for her impairment meet or equal the Listing, she is presumed disabled. Id.

For some impairments, however, there is no Listing. 20 C.F.R. § 404.1526(b)(2). For such impairments, the Commissioner directs that an "equivalency" analysis should be undertaken with a comparable or similar impairment that is listed. Id.; SSR 12-2p (noting that no listing exists for FM so at step three adjudicators must consider whether the claimant's FM symptoms equal a comparable listing such as 14.09D, the listing for inflammatory arthritis); SSR 17-2p (stating if an individual has an impairment that is not listed, the adjudicator must at step three compare the findings for

64

the claimant's impairment with closely analogous listed impairments and, if the findings are at least of equal medical significance to those of a listed impairment, the claimant should be found to have met the equivalency test). In order to qualify under the equivalency test, the claimant's findings for her unlisted impairment must be at least equal in severity and duration to the findings for the analogous listed impairment.  20 C.F.R. § 404.1526(a).

The burden is on the claimant at step three to demonstrate medical equivalency.  Sullivan v. Zebley, 493 U.S. 521. 529-31 (1990).  In order to show that an unlisted impairment is equivalent to a listed impairment, the claimant must "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  Id. at 530 (emphasis in original); Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995).  "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  Zebley, 493 U.S. at 530.

The standard for medical criteria of the Listings is at "a higher level of severity than the statutory standard [for disability]."  Id.  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.' "  Id.  The Listings were intended to operate as a presumption of disability, making further inquiry unnecessary.  Id.  By design, then, the Listings are more restrictive than the statutory disability standard.  Id.

Whether there is an equivalency with a Listing is a medical judgment and the Commissioner must consider an expert's opinion on the issue.  See 20 C.F.R. § 404.1526(b); SSR 96-6p; Barnett v. Barnhart, 381 F.3d 664, 670 (7th Cir. 2004).

Ms. Patrick's impairments of migraine headaches and FM are unlisted impairments.  Therefore, the ALJ should have undertaken an analysis at step three that compared Ms. Patrick's findings from these impairments with analogous impairments that are listed.  SSR 12-2p; SSR 17-2p.  Instead, neither the ALJ nor the Appeals Council engaged in any analysis of FM or migraine headaches at step three.  Ms. Patrick alleges this to be reversible error.

Ms. Patrick also alleges reversible error with regard to her personality disorder.  Personality disorder *is* a listed impairment.  See Listing 12.08.  The ALJ did evaluate whether Ms. Patrick's "mental impairments, considered singly and in combination," met Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  Ms. Patrick asserts error because the ALJ never analyzed whether Ms. Patrick met or equaled Listing 12.08, the Listing for personality disorder.

Further muddling the step three analysis is the fact that the ALJ found Ms. Patrick's severe medically determinable impairments at step two to include FM, migraine headaches, and personality disorder.  AR32.  However, on appeal to the Appeals Council, the Appeals Council purported to adopt the ALJ's

decision at steps two and three, but omitted Ms. Patrick's personality disorder as a severe impairment at step two. AR6, 12.

The Appeals Council did not acknowledge it was altering or amending the ALJ's step two conclusions, so the court is left to wonder whether the omission of personality disorder as a severe medically determinable impairment was inadvertent. If the Appeals Council omitted that disorder intentionally, it gave no rationale or analysis in the record for why it would have done this. These are clear errors on the part of the ALJ and the Appeals Council.

However, the court returns to first principles. It is Ms. Patrick's burden to show she meets or equals a listing. Zebley, 493 U.S. at 529-31; Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). She makes no attempt to demonstrate that the medical findings[19] with regard to her FM or migraine headaches equal in duration and severity all the criteria of an analogous listing. For her personality disorder, she makes no attempt to show that the findings of this mental impairment meet the criteria of Listing 12.08. If Ms. Patrick's findings with regard to these three impairments cannot arguably meet or equal the designated listing, or in the case of FM and migraines an analogous listing, then the Commissioner's mistakes at step three would be harmless error.

The court in Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003), reached a similar conclusion. The claimant alleged the ALJ erred

_____

[19] Findings are "symptoms, signs, and laboratory findings." 20 C.F.R. § 404.1528.

by not considering or discussing at step three whether his mental impairments equaled the criteria in Listing 112.05D for mental retardation.  Id.  The court expressed a preference for ALJs to explicitly discuss relevant Listings, but held it was harmless error in this case.  Id.

Likewise, in Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), and Briggs v. Callahan, 139 F.3d 606, 609 (8th Cir. 1998), the courts found harmless error when the agency failed to explain how or whether a claimant met a particular listing at step three where the evidence in the record showed substantial evidence in favor of not meeting or equaling the listing.

However, all three of these cases engaged in an analysis of the evidence and concluded independently that the claimants in those cases could not meet or equal the asserted Listing or analogous Listing.  Pepper, 342 F.3d at 855; Dunahoo, 241 F.3d at 1037; and Briggs, 139 F.3d at 609.  Here, the court's effort to engage in such independent analysis is hampered by Ms. Patrick's presentation of the issues.

For example, with regard to her migraines, Ms. Patrick noted that there *used to be* a specific reference in the Commissioner's POMS regarding comparing migraines to the Listing for non-convulsive epilepsy.  See Docket No. 20 at p. 10.  However, that reference in the POMS is no longer in effect and the Commissioner has removed the Listing for non-convulsive epilepsy.  The court cannot compare Ms. Patrick's medical findings to obsolete program guidance and Listings that do not exist anymore.  Ms. Patrick does not suggest any other analogous Listing to which her migraine findings can be compared.

68

The court will not scour the entirety of the Listings in an attempt to find an analogous Listing for her.  It is *Ms. Patrick's* burden to show she met or equaled a Listing.  That requires, at a minimum, that she *identify* an analogous Listing and explain why she has at least a colorable argument that she met or equaled that listing.

With regard to her FM condition, Ms. Patrick discusses SSR 12-2p and suggests the ALJ *could have* compared her medical findings to Listing 14.09D—or any other analogous Listing.  But Ms. Patrick herself never discusses the requirements of Listing 14.09D and compares that criteria to her own medical findings and explains how she meets or equals Listing 14.09D.  Furthermore, her argument leaves the question open whether there are other, more analogous listings the court should consider.

As to Ms. Patrick's personality disorder, there is a Listing identified by Ms. Patrick—Listing 12.08.  Listing 12.08 requires Ms. Patrick to show both parts A and B as follows:

A.  Medical documentation of a pervasive pattern of one or more of the following:

1.  Distrust and suspiciousness of others;
2.  Detachment from social relationships;
3.  Disregard for and violation of the rights of others;
4.  Instability of interpersonal relationships;
5.  Excessive emotionality and attention seeking;
6.  Feelings of inadequacy;
7.  Excessive need to be taken care of;
8.  Preoccupation with perfectionism and orderliness; or
9.  Recurrent, impulsive, aggressive behavioral outbursts.

AND

69

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    1. Understand, remember, or apply information (see 12.00E1);
    2. Interact with others (see 12.00E2);
    3. Concentrate, persist, or maintain pace (see 12.00E3);
    4. Adapt or manage oneself (see 12.00E4).

<u>See</u> Listing 12.08.

Listing 12.08 and Listings 12.04 and 12.06 have some overlap, but they are not identical. For Listing 12.08, a claimant must satisfy both paragraph A and paragraph B criteria listed above. For Listings 12.04 and 12.06, there is a paragraph B that is identical to the paragraph B in Listing 12.08, but a claimant need not necessarily satisfy the paragraph B criteria for Listings 12.04 and 12.06. Instead, for depression and anxiety Listings, there are three paragraphs—A, B, and C—and the claimant can show disability by satisfying *either* the paragraph A and B criteria, *or* by satisfying the paragraph A and C criteria. Thus, in the abstract, the conclusion that a claimant does or does not meet the criteria for Listings 12.04 and 12.06 is simply not conclusive as to Listing 12.08. A claimant could conceivably show presumptive disability under Listings 12.04 and 12.06 by satisfying the paragraph A and C criteria, which would not answer the question whether the same claimant could satisfy the criteria for Listing 12.08.

However, that abstract observation does not further Ms. Patrick's claim for reversal under the facts of this case. In this case, the ALJ *discussed the paragraph B criteria*, which is *identical* to each of the Listings, and found Ms. Patrick did not meet that paragraph B criteria. <u>See</u> AR33, Listings 12.04,

12.06, & 12.08.  Therefore, even though the ALJ did not discuss Listing 12.08 specifically, its findings and conclusions as to the paragraph B criteria would apply *equally to all three Listings* since all three Listings contain identical paragraph Bs.  The court can infer, then, that if the ALJ had discussed Listing 12.08, it would have found Ms. Patrick did not meet that the paragraph B criteria for Listing 12.08.[20]

In addition, Ms. Patrick does not discuss the application of Listing 12.08 paragraph A to the medical evidence in the AR.  She does not point the court to where, for instance, it is documented that Ms. Patrick had a "distrust and suspiciousness of others;" "detachment from social relationships;" "disregard for and violation of the rights of others;" "instability of interpersonal relationships;" "excessive emotionality and attention seeking;" "feelings of inadequacy;" "excessive need to be taken care of;" "preoccupation with perfectionism and orderliness;" or "recurrent, impulsive, aggressive behavioral outbursts."  It is Ms. Patrick's burden to demonstrate she met Listing 12.08, and meeting that Listing requires satisfying *both* the paragraph A criteria as well as the paragraph B criteria.

---

[20] Paragraph A of each listing contains findings unique to each mental disorder and, although there is some overlap, they are by no means identical. The ALJ appears to have assumed the paragraph A criteria for Listings 12.04 and 12.06 were met because those criteria are not discussed in the opinion. See AR33-34. In addition, both Listing 12.04 and 12.06 contain a requirement in paragraph C that the disorder be "serious and persistent"—it must have lasted for over two years and there must be ongoing medical treatment that diminishes symptoms plus a minimal capacity to adapt to changes in the environment.  See Listing 12.04C and 12.06C.  This paragraph C criteria was discussed by the ALJ in its opinion, but the paragraph C criteria has no application at all to the personality disorder listing.  See AR34; Listing 12.08.

The ALJ did not discuss or consider Listing 12.08 even though it had previously concluded Ms. Patrick suffered from severe medically determinable personality disorder. However, the ALJ did discuss the paragraph B criteria, which is identical for the Listings he *did* consider—12.04 and 12.06—as well as for Listing 12.08. Therefore, the court concludes it was harmless error for the ALJ to have omitted a discussion of Listing 12.08 pertaining to personality disorder. The analysis engaged in by the ALJ with regard to the paragraph B criteria would have been identical for all three Listings. Therefore, the court concludes that, had the ALJ discussed Listing 12.08, it would have concluded that Listing was also not met.

The court finds Ms. Patrick has failed to establish grounds for reversal at step three. Although she clearly shows that the ALJ failed to consider Listing 12.08, that was harmless error as the analysis of the paragraph B criteria for Listing 12.08 would have been identical to the analysis of the same criteria contained in Listings 12.04 and 12.06. As to the FM and migraine impairments, Ms. Patrick fails to carry her burden to show there is an analogous Listing the ALJ should have considered as to each impairment and that evidence in the record creates a colorable argument that she met those Listings. The court affirms the Commissioner's step three decision.

**G.     Step Four**

Ms. Patrick alleges the Commissioner erred in formulating her RFC at step four in three ways: (1) failing to include functional limitations from Ms. Patrick's FM; (2) failing to include functional limitations from Ms. Patrick's

migraines; and (3) failing to formulate limitations imposed by her mental impairments. Included within the third issue is Ms. Patrick's argument that the ALJ failed to properly evaluate Dr. Christopherson's opinion as to her mental impairments. The Commissioner asserts his step four decision is supported by substantial evidence in all respects and asks the court to affirm the agency's decision.

### 1.    Law Applicable to Step Four

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[21] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate

---

[21] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

issues must still be considered by the ALJ in making these determinations.  Id.
However, the ALJ is not required to give such opinions special significance
because they were rendered by a treating medical source.  Id.

"Where there is no allegation of a physical or mental limitation or
restriction of a specific functional capacity, and no information in the case
record that there is such a limitation or restriction, the adjudicator must
consider the individual to have no limitation or restriction with respect to that
functional capacity."  SSR 96-8p.  However, the ALJ "must make every
reasonable effort to ensure that the file contains sufficient evidence to assess
RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion
describing how the evidence supports each conclusion, citing specific medical
facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must
. . . explain how any material inconsistencies or ambiguities in the evidence in
the case record were considered and resolved."  Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type
of work, the claimant must have the ability to perform the requisite acts day in
and day out, in the sometimes competitive and stressful conditions in which
real people work in the real world."  Reed, 399 F.3d at 923 (citations omitted,
punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of
an individual's ability to do sustained work-related physical and mental
activities in a work setting on a regular and continuing basis" for "8 hours a
day, for 5 days a week, or an equivalent work schedule.").

A finding at step two or step three that a claimant has an impairment or limitations does not "magically disappear when the analysis moves to step four." Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). However, just because a limitation is found at an earlier step also does not mean there automatically must be a corresponding functional limitation in the RFC formulated at step four. Id. Instead, the limitations found at step two or three should be considered when formulating RFC, but they do not "automatically translate into limitations on the claimant's ability to work." Id. The question is whether substantial evidence in the record as a whole supports the ALJ's RFC formulation. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

## 2. Fibromyalgia

The only opinion evidence in the record from a medical source regarding Ms. Patrick's functional limitations from her physical impairments are the state agency physicians' opinions. AR92-100, 112-21. Those opinions are identical, with the first being issued December 18, 2015, and the second being issued March 9, 2016. Id. Ms. Patrick does not allege her FM changed in any significant way from the dates of these medical opinions to the date of the ALJ decision on December 6, 2017.

Both physicians found Ms. Patrick's FM to be a severe medically determinable impairment. AR95, 115. They reviewed her medical records and her function report. AR93, 113-14. They found her physical impairments could reasonably be expected to produce her pain and symptoms, but that the

functional limitations resulting from that pain and symptoms were not as limited as Ms. Patrick stated.  AR96, 117.

Both physicians opined Ms. Patrick's physical impairments imposed exertional limitations as follows:  she could occasionally (1/3 or less of an 8-hour day) lift 20 pounds; she could frequently (1/3 to 2/3 of a day) lift 10 pounds, she could stand and walk with normal breaks for 6 hours a day, she could sit for 6 hours a day, and she was not limited in her ability to push or pull except for the limits ascribed to poundage for lifting.  AR97, 117-18.

Both physicians opined Ms. Patrick's physical impairments imposed the following postural limitations:  she could occasionally climb ramps or stairs; occasionally climb ladders, ropes, and scaffolds; she was unlimited in her ability to balance; and she could occasionally stoop, kneel, crouch, and crawl.  Id.  Both physicians opined Ms. Patrick had no manipulative, visual, communicative, or environmental limitations.  AR97-98, 118.  Both doctors ascribed all of the above functional limitations to Ms. Patrick's FM and her back pain.  AR97-98, 117-18.

The ALJ adopted the state agency opinions as to Ms. Patrick's physical RFC with few changes.  AR34.  The ALJ changed the RFC to eliminate all climbing of ladders or scaffolds, all working at unprotected heights, and all work with dangerous moving mechanical parts.[22]  AR34.

_____

[22] The ALJ omitted any reference to the ability to climb ropes.  AR34. The state agency physicians' opinions that Ms. Patrick, aged 46, could "occasionally" climb ropes strains credulity, especially when one realizes the definition of "occasionally" is up to 1/3 of an 8-hour workday, which works out to about 2 ½ hours a day.

Ms. Patrick alleges the ALJ erred in discounting her claims of disabling pain due to FM by relying on the lack of objective medical evidence. Ms. Patrick argues this misconstrues the very nature of FM, which is a diagnosis of elimination and does not have objective verifying evidence.

Ms. Patrick's characterization of the ALJ's opinion is not wholly fair. The ALJ did cite to the fact Ms. Patrick's medical records failed to demonstrate abnormal gait and that her exams have often been described as non-focal. AR37. But the ALJ also emphasized that the medical records do not document Ms. Patrick being in acute distress or having spasms or marked muscle tightness. Id. As will be seen, the absence of spasms or "tender-points" is integral to evaluating FM.

The Commissioner relies on criteria from the American College of Rheumatology (ACR) to determine the existence of FM. See SSR 12-2p. The Commissioner will find FM to be established if the medical evidence matches either the ACR's 1990 criteria or the ACR's 2010 criteria, and the conclusion of FM is not inconsistent with the other evidence in the AR. Id.

The 1990 ACR criteria requires three elements be met:

1.      A history of widespread pain in all the quadrants of the body, both above and below the waist and axial skeletal pain that has lasted at least 3 months.

2.      At least 11 positive tender points on physical examination, to be found bilaterally and both above and below the waist. The tender point sites located on each side of the body are as follows:
                --occiput
                --low cervical spine
                --trapezius muscle
                --supraspinatus muscle
                --second rib

--lateral epicondyle
                    --gluteal
                    --greater trochanter
                    --inner aspect of the knee
          In testing tender-point sites, the physician should perform
    digital palpation with an approximate force of 9 pounds (enough to
    make the examiner's thumbnail blanch). The tender-point
    is positive if the patient experiences any pain when applying this
    amount of pressure to the site.

    3.      Evidence that other disorders that could cause the
    symptoms or signs were excluded. Laboratory testing may include
    imaging and other laboratory tests.

<u>See</u> SSR 12-2p.

          The 2010 ACR criteria also requires three slightly different criteria:

    1.      A history of widespread pain.

    2.      Repeated manifestations of six or more FM symptoms, signs,
    or co-occurring conditions, especially manifestations of fatigue,
    cognitive or memory problems ("fibro fog"), waking unrefreshed,
    depression, anxiety disorder, or irritable bowel syndrome; and

    3.      Evidence that other disorders that could cause these
    repeated manifestations of symptoms, signs, or co-occurring
    conditions were excluded.

<u>Id.</u>

          Ms. Patrick is correct in asserting that there is no single confirming

diagnostic test for FM and that FM is a diagnosis of exclusion, but as one

can see from the ACR criteria above, objective medical evidence does play

a role. Only objective medical evidence can show the existence of positive

tender-points and laboratory testing is instrumental in ruling out other

causes for the patient's symptoms. SSR 12-2p. When the ALJ cited to

the fact that Ms. Patrick's medical evidence showed no muscle spasms or

marked muscle tightness, the court understands this to refer to the ACR

criteria for positive tender-points. In other words, the absence of any documentation of this in the AR undermines the severity of the FM symptoms and their impact on Ms. Patrick's functioning.

The ALJ stated Ms. Patrick has received no injections or physical therapy for her FM, which he stated would have been expected treatment modalities if the pain were as severe as Ms. Patrick stated. AR39. Ms. Patrick alleges the ALJ's observations about injections was wrong— that she did indeed receive multiple injections for FM. See Docket No. 20 at p. 17 n.2. The AR does indeed reveal Ms. Patrick received injections on multiple occasions, but the record does not tie those injections to her FM condition. She received injections for pain relief, but she suffered from at least three impairments that could cause pain: her back condition, her FM and her migraines. It is not at all clear that the injections Ms. Patrick received were specifically for FM pain.

But, finally, the other reason relied upon by the ALJ in formulating Ms. Patrick's physical RFC was the longitudinal record and Ms. Patrick's ADLs. AR35-39. Ms. Patrick had been diagnosed with FM a long time ago and had worked at an SGA level for many years while suffering from FM, thus leading the ALJ to conclude her FM pain was not disabling. AR39. Ms. Patrick did not allege her FM symptoms had noticeably worsened (and she does not allege that here before this court). Id. Also, the ALJ found her regular exercise routine; helping to care for her mother, grandmother, and disabled sons; performing regular housework;

and attending to her own personal care showed Ms. Patrick's FM did not impose disabling limits on her ability to function.  AR37-39.  Whether the ALJ's decision is supported by substantial evidence is addressed in the next section.

### 3. Migraines

As with Ms. Patrick's FM impairment, the only opinion evidence in the record from a medical source regarding Ms. Patrick's functional limitations from her physical impairments are the state agency physicians' opinions.  AR92-100, 112-21.  Those opinions are identical, with the first being issued December 18, 2015, and the second being issued March 9, 2016.  Id.

Both physicians found Ms. Patrick's migraines to be severe medically determinable impairments.  AR95, 115.  They reviewed her medical records and her function report.  AR93, 113-14.  They found her physical impairments could reasonably be expected to produce her pain and symptoms, but that the functional limitations resulting from that pain and those symptoms were not as limited as Ms. Patrick stated.  AR96, 117.

Although both physicians opined Ms. Patrick had the functional limitations as discussed above, they attributed all of these functional limitations to Ms. Patrick's FM and her back pain.  AR97-98, 117-18.   The doctors acknowledged Ms. Patrick suffered from severe medically determinable migraines, but apparently ascribed no functional limitations to that impairment.  Id.  The only explanation in the reports is "[t]aking medication for migraines."  AR98, 118.  From this, the court surmises the state agency

physicians opined no functional limitations were imposed by Ms. Patrick's migraines because the symptoms from that condition were entirely and satisfactorily controlled by her medications.

Ms. Patrick *does* allege her migraines worsened starting in December, 2014, and continuing to July, 2016. See Docket No. 20 at p. 20. She alleges this included episodes where oral medication and Fentanyl patches were unable to control her pain and she had to receive injections from her doctor. Id. She argues the absence of any functional limitations in her physical RFC attributable to her migraines was error.

Here, it becomes difficult to separate out symptoms, treatments, and functional limitations from Ms. Patrick's three alleged sources of pain: FM, a back impairment, and migraines. For example, the parties' joint statement of facts reveals at places that Ms. Patrick was receiving Fentanyl patches and hydrocodone for her back condition (see, e.g. AR457, 492), but other places those medications are attributed to FM or migraines (see, e.g. AR439, 454). She received numerous injections for pain relief, but rarely do the records indicate whether those injections were treatments for FM, back pain, or migraines.

Ms. Patrick has suffered from migraines since she was nine years old. She worked most of her adult life until she quit her job September 1, 2015, the alleged date of disability onset. The AR contains medical records dating back one year prior to that alleged date of onset. From September, 2014, to September, 2015, Ms. Patrick's physician tried several different medications

and dosages for her migraines. AR460, 466, 469, 472, 475, 477, 483, 489, 491-92. There followed after this a stretch of fairly stable pain control.

Ms. Patrick saw her physician, Dr. Miner, on August 22, September 1 and 17, and October 2, 2015, and did not complain about her migraines. AR441, 443, 445, 451. No additional or different treatment for migraines was prescribed during this period. Id.

On November 2, 2015, Ms. Patrick's Hydrocodone prescription was continued "as needed" for her migraines, but there is no notation her migraines had changed in frequency or severity. AR439. Ms. Patrick saw Dr. Miner on February 2, March 3, and April 4, 2016, and did not complain of migraines. AR509-10, 606-07, 609-10.

On April 11, 2016, she saw Dr. Miner for a migraine that had lasted three days and received an injection for the pain. AR603-04. When she saw Dr. Miner again on April 26, she reported her headaches were better controlled. AR600.

She next saw Dr. Miner on June 2, 2016, and reported having "some migraines." AR597. No new treatment was prescribed for that condition. Id. On July 1, 2016, Ms. Patrick reported doing "quite well" overall. AR594. She reported some migraines "on and off." AR594. Her medications were not changed, but she received an injection for pain (unspecified). AR595.

Ms. Patrick saw Dr. Miner three times (August 1 and 29, and September 26, 2016), with no notable episodes of migraine pain uncontrolled by prescribed medications, no injections for migraine pain control, and no

changes in migraine medication.  AR582-84, 588, 591.  She reported good days and bad days, but Dr. Miner noted overall well-controlled pain.  AR588.

On October 28, 2016, Ms. Patrick reported worsening migraines as well as other issues.  AR580.  Dr. Miner increased her Lyrica dosage, but for which of her impairments it is not clear.  Id.  On November 8, she saw Dr. Miner for migraine pain, stating she had not received her Lyrica in the mail.  AR578.  Dr. Miner gave her a Decadron injection.  Id.

On December 22, 2016, Ms. Patrick made an appointment because she needed a refill of her Hydrocodone prescription and she only had two [Fentanyl] patches left.  AR574.  She told Dr. Miner she was experiencing a migraine the last couple of days and he gave her an injection for pain.  Id.

On January 12, 2017, Ms. Patrick saw Dr. Miner to begin weight loss medication--phertermine.  AR894.  Although she "admitted" she suffered from chronic headaches, she did not report any worsening, did not seek an injection, and Dr. Miner did not change any of her migraine medications.  Id.

Two months later, Ms. Patrick reported increased migraines due to stress on March 9, 2017.  AR890.  Dr. Miner did not change her medications but did give her an injection for pain, though it is not clear whether it was for her migraines or her back pain, of which she also complained on this visit.  AR890-91.

On March 23, 2017, Dr. Miner assessed Ms. Patrick to have migraine "without status migrainosus, not intractable, unspecified migraine type."  AR1313.  He gave Ms. Patrick pain injections on this date.  Id.

Ms. Patrick saw Dr. Miner on April 10, 2017, and did not report any migraine symptoms or issues. AR1310-11. She saw Dr. Miner again on May 16 and reported having more migraines. AR1307. Dr. Miner adjusted her headache medication. Id.

Ms. Patrick saw Dr. Miner on May 16, 2017, because her weight loss prescription for phentermine was ending. AR1307. Dr. Miner recommended she discontinue the phentermine. Id. Ms. Patrick was cantankerous about doing so as she had lost weight by taking the phentermine. Id. She reported having more migraines and asked that her Fentanyl dosage be increased. Id. Dr. Miner did increase her Fentanyl dosage. AR1308. Dr. Miner substituted Focalin, another weight loss drug, in place of the phentermine. AR1307. Focalin and phentermine are both central nervous system stimulants. See www.drugs.com/focalin.html, & --phentermine.html.

Ms. Patrick saw Dr. Miner on June 6, and reported her headaches were better, but reported unwelcome side effects since she had increased her Fentanyl dosage including hyperactivity, hives, difficulty thinking, and more aggression. AR1305. Dr. Miner continued Ms. Patrick on her current dosage and wanted to recheck her in a week to see if the side effects dissipated. Id.

On June 27, 2017, Ms. Patrick was admitted as a psychiatric inpatient to the Human Services Center ("HSC") after a suicide gesture or attempt. AR1059. Once there, the staff found "questionable opioid abuse" and gradually decreased a number of her medications including Topamax, Prozac, Lyrica,

Focalin, clonazepam, and Fentanyl.  Id.  Ms. Patrick "responded quite nicely to the change in medications."  Id.

She next saw Dr. Miner on July 11, 2017, after her discharge from HSC and denied having any headaches.  AR1301.  She saw Dr. Miner again on July 25 and did not complain of any migraines.  AR1299.  On August 25 she reported intermittent headaches, but no new medication or injections were prescribed.  AR1297.  On this last record in the AR, Ms. Patrick reported "feeling okay" and "doing well."  Id.

Summarizing the medical records from September, 2015, to the time of the ALJ hearing, for the one-year period from September, 2015, to October, 2016, Ms. Patrick only complained of a single migraine (April 11, 2016), that was not controlled by her normal daily medications.  From October, 2016, to December, 2016, there were three office visits where Ms. Patrick complained of migraine pain, but two of those visits (November 8 and December 22) were occasioned because Ms. Patrick had either not received her prescription medication in the mail (Lyrica) or had run out and needed a new prescription (Hydrocodone).  No migraine complaints were made from December 22, 2016, until March 9, 2017.  From March 9 to May 16, Ms. Patrick reported intermittent headaches that, by June 6, were well-controlled.  After being taken off of her narcotic pain medications while an inpatient at the HSC, Ms. Patrick did not complain of migraines for the next two months, which is where the AR records stop.

The ALJ rejected Ms. Patrick's complaints of disabling pain due to her migraines because she had them for virtually her entire life, she had been able to work most of her adult life with the condition, her medical records showed that she had long periods of repose with no or minimal symptoms, her own doctor reported her migraines were not intractable, and her ADLs did not show a disabling level of pain. AR36-39.

The court finds this conclusion to be supported by substantial evidence in the record. Ms. Patrick's assertion that her migraine impairment showed a marked increase in severity and number on or after the date of alleged disability onset is not borne out by an examination of the records in the AR. Instead, as summarized above, when Ms. Patrick was able to have access to her prescribed medications, she rarely had break-through migraines that required additional treatment.

The court makes this note with regard to Ms. Patrick's back pain, migraines, and FM: the medical records pertaining to the treatment of these pain-causing conditions are muddled. As noted above, a medication may have been prescribed for one condition initially, then "continued" for a different condition on a later date, then "increased" for a different condition on yet another occasion. Also, injections for pain relief were given at different times for FM, for back pain, for migraines, or for no specified condition—just pain. To fault the ALJ or the Appeals Council for not separating out the disabling affects of pain from Ms. Patrick's various pain-causing conditions is not realistic. The ALJ did do so, to the extent the records in the AR allow for

separate analyses.  Ultimately, though, at step four, the question is what functional restrictions are imposed on Ms. Patrick as a result of pain from all of her conditions combined.

In this regard, the HSC records are telling.  Although Ms. Patrick repeatedly expressed apprehension over being taken off her many narcotic pain relievers at HSC, and initially she stated she was experiencing serious pain symptoms, the HSC staff repeatedly noted that Ms. Patrick showed no outward sign of being in pain from either FM, her back, or migraines.  She moved fluidly and easily, had no trouble getting up from a seated position, never held her head, never grimaced, showed no pain behavior during treatment of her neck and shoulders, and never had abnormal gait from back pain. AR1045, 1048, 1053, 1056-58.  These findings were recorded at a time Ms. Patrick was under observation 24 hours a day for 10 days and only being given acetaminophen for pain.[23]  Furthermore, at the end of her stay at HSC when she had been weaned from all her narcotics, she herself stated "she feels better with less pain medication."  AR1060.

The ALJ rendered a more favorable physical RFC than the state agency physicians' RFC, and those physicians' opinions are the only medical opinion evidence in the record.  And, although the Appeals Council found Ms. Patrick's back pain caused no functional limitations, the Council did not change the

---

[23] The acetaminophen is abbreviated "APAP" in the HSC records, a reference to the drug's chemical name:  acetyl-para-aminophenol.

ALJ's physical RFC formulation. The ALJ's RFC did include accommodations for Ms. Patrick's back impairment.

The court finds the ALJ's decision regarding physical RFC is supported by substantial evidence in the record and will not reverse on this basis. This includes the step two issue regarding Ms. Patrick's back impairment. On this record, in this case, and with these facts, the court finds it was harmless error for the ALJ to omit Ms. Patrick's back condition as a severe medically determinable impairment at step two.

### 4. Mental Impairments

The ALJ formulated the following mental RFC for Ms. Patrick:

> Mentally, the claimant retains the ability to understand, remember and carry out short, simple instructions and interact appropriately with supervisors and co-workers on an occasional basis. The claimant should have no interaction with the public. The claimant can respond appropriately to changes in a routine work setting only and make judgments on only simple work-related decisions. The claimant must work in isolation or in small groups of people not to exceed five or six in number. Lastly, the claimant is limited to goal-oriented work (defined as work where the claimant is given a task or series of tasks to perform and it does not matter when the task is accomplished so long as completed by end of the workday or work shift).

AR34-35.

Contrary to Ms. Patrick's statement in her brief (Docket No. 20 at p. 21), the ALJ did not reject the opinions of the state agency psychological consultants. Rather, the ALJ purported to give those opinions "less weight" due to the evidence which was introduced to the record after the rendering of those opinions. AR38. Ms. Patrick asserts, in reality, the ALJ gave no weight

to state agency opinions because the state agency psychological consultants gave no mental RFC opinions.  AR22.

The ALJ stated it was giving the state agency psychological consultants' opinions "less weight" because evidence received after those opinions were rendered "suggest[ed] the claimant would be limited to unskilled work and possess other mental limitations as noted above."  AR38.  The state agency psychological consultants concluded Ms. Patrick did not suffer from severe mental impairments at step two, so Ms. Patrick is correct that they did not then go on to render a mental RFC opinion.  AR95, 115.

The ALJ also gave "less weight" to the opinion of Ms. Patrick's treating medical source, Dr. Christopherson, because the ALJ stated his opinion was "grossly inconsistent with the evidence as a whole."  AR38.  Ms. Patrick alleges the ALJ erred in discounting Dr. Christopherson's opinion and that the mental RFC is not supported by substantial evidence in the record.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;
>
> --whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,'" this is one factor that can support

an ALJ's decision to discount or even disregard a treating physician's opinion.
House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner,
499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir.
2005)).  "The opinion of an acceptable medical source who has examined a
claimant is entitled to more weight than the opinion of a source who has not
examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006)
(citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th
Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating
physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849.
Generally, the opinions of non-examining, consulting physicians, standing
alone, do not constitute "substantial evidence" upon the record as a whole,
especially when they are contradicted by the treating physician's medical
opinion.  Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing
Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).  However, where opinions
of non-examining, consulting physicians along with other evidence in the
record form the basis for the ALJ's decision, such a conclusion may be
supported by substantial evidence.  Harvey, 368 F.3d at 1016.  Also, where a
nontreating physician's opinion is supported by better or more thorough
medical evidence, the ALJ may credit that evaluation over a treating
physician's evaluation.  Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008)
(citing Casey v. Astrue, 503 F.3d 687 at 691-692 (8th Cir. 2007)).  The ALJ
must give "good reasons" for the weight accorded to opinions of treating

physicians, whether that weight is great or small.  Hamilton v. Astrue, 518

F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. 404.1527(c)(2).

Certain ultimate issues are reserved for the Agency's determination.

20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is

entitled to no deference because it "invades the province of the Commissioner

to make the ultimate disability determination."  House, 500 F.3d at 745 (citing

Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).  See 20 C.F.R.

§ 404.1527(d).  The ultimate issues reserved to the Agency are as follows:

  1.    whether the claimant is disabled;

  2.    whether the claimant is able to be gainfully employed;

  3.    whether the claimant meets or equals a Listing;

  4.    what the claimant's RFC is; and

  5.    what the application of vocational factors should be.

See 20 C.F.R. § 404.1527(d)(1) and (2); see also Heino v. Astrue, 578 F.3d 873,

879 (8th Cir. 2009) (ALJ need not adopt physician's opinion on the ultimate

issue of whether claimant can work); Wagner, 499 F.3d at 849 (same);  Qualls

v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (same).  The RFC determination is

specifically noted to be one of those determinations that are an ultimate issue

for the Agency to determine.  20 C.F.R. § 404.1527(d)(2); Cox v. Astrue, 495

F.3d 614, at 619-620 (8th Cir. 2007).

Ms. Patrick's claim was filed in September, 2015.  As to claims filed with

the SSA *after* March 27, *2017*, the regulations regarding acceptable medical

sources, medical opinions, and how the SSA must articulate the way it weighs

the medical evidence, have been completely re-written.  See 20 C.F.R.

§§ 416.920c, 404.1520c.  Under those new regulations, a treating physician's

opinion will no longer be given controlling weight.  Instead, the supportability

and consistency of an opinion will be the paramount factors for the ALJ to

consider when evaluating a medical opinion.  Compare:  20 C.F.R. § 404.1520c

(applicable to claims filed on or after March 27, 2017) to 20 C.F.R.

§ 404.1527(c) (applicable to claims filed before March 27, 2017).  See also:

https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html.

Ms. Patrick discusses the new regulation at length in her brief, but the court

finds the new regulation inapplicable to her claim by the very terms of the new

regulation—i.e. it only applies to claims filed *on or after* March 27, 2017, which

excludes Ms. Patrick's 2015-filed claim.

　　　　Another discrepancy in Ms. Patrick's brief:  she misquotes

Dr. Christopherson's opinion.  Ms. Patrick writes that the doctor opined

"[Ms. Patrick] had been fairly functional some time ago, [she] worked with the

developmentally delayed and this physician had known her in that capacity.

There is no way she could do ***a*** job now."  Docket No. 20 at p. 25.  The clear

upshot of the (mis)quote is that Dr. Christopherson opined Ms. Patrick was not

capable of doing *any* job in her present state.  Only that is not what

Dr. Christopherson wrote.

　　　　Dr. Christopherson wrote "[Ms. Patrick] had been fairly functional some

time ago, [she] worked with the developmentally delayed and this physician

had known her in that capacity.  There is no way she could do ***that*** job now."

AR614.  In other words, Dr. Christopherson opined Ms. Patrick could not

return to her prior job working with developmentally delayed persons.  Id.  As it

happens, the ALJ fully agreed with Dr. Christopherson because the ALJ held

Ms. Patrick could not return to any of her past relevant work.  AR39.  Thus,

when the quote from Dr. Christopherson is cited accurately, it shows a subject

of *agreement* between he and the ALJ instead of a point of disagreement.

That being said, Dr. Christopherson did opine in his treatment notes that

he believed Ms. Patrick was incapable of working and that she should qualify

for disability benefits.  AR648, 756, 946.  As pointed out above, whether a

claimant can work, is disabled, or what their RFC is are among the ultimate

issues reserved solely to the ALJ.  20 C.F.R. § 404.1527(d).  Such statements

are definitionally *excluded* from the definition of "medical opinions," even if the

statements are rendered by a treating physician  Id. (opinions on ultimate

issues "are not medical opinions" "because they are administrative findings

that are dispositive of a case; i.e. that would direct the determination or

decision of disability.").

The gravamen of the ALJ's discounting of Dr. Christopherson's opinion

was that it was "grossly" inconsistent with the record as a whole.  AR38.

Ms. Patrick in her brief concentrates on whether Dr. Christopherson's opinion

was inconsistent with *his own records*, rather than inconsistent with the record

as a whole.[24]  The court addresses this argument, but notes that it was *not* the sole basis for the ALJ's decision.

Dr. Christopherson's own records detail a fluctuating mental status on Ms. Patrick's part.  This is to be expected.  Most people with mental impairments—most people generally—have good days and bad, periods of well being and "down" periods.  Dr. Christopherson noted Ms. Patrick had PHQ-9[25] scores of between 20 and 27, indicative of severe depression over a two-year period.  AR434, 518, 522, 648, 873, 1244, 1280.  Dr. Christopherson saw Ms. Patrick primarily for medication management; his visits with her averaged about once per month for 15 minutes.  See, e.g. AR434, 517, 520-21 (detailing 3 visits one month apart for 15 minutes each).  Sometimes several months would pass between appointments with Dr. Christopherson.  AR872-73. Dr. Christopherson rendered his mental RFC opinion immediately after a three-month period where he had not seen Ms. Patrick.  AR872.

It appears that Ms. Patrick's counseling sessions changed from once every several weeks to daily appointments on January 30, 2017, shortly after Dr. Christopherson rendered his mental RFC opinion.  AR899-900.  For the

---

[24] Ms. Patrick makes much of the error by the ALJ in asserting Dr. Christopherson noted repeatedly she made good eye contact, but then concedes Ms. Patrick's counselors and social workers repeatedly noted good eye contact.  This is a difference without a distinction.  The question is whether the ALJ's decision is supported by the AR, not whether the ALJ correctly cited the right exhibit.

[25] See Footnote 8, *supra.*  This is a questionnaire self-administered by a patient designed to measure depression.

rest of the time leading up to the ALJ hearing, Ms. Patrick saw counselors or social workers on a daily or near-daily basis.  See, e.g. AR915-45.

Dr. Christopherson did opine that Ms. Patrick's mental impairments would cause her to be absent from work four or more times per month.  AR617. On the whole, Dr. Christopherson's records tend to show a bleaker picture than the visits from counselors or social workers.  Dr. Christopherson stated that Ms. Patrick tended to "awfulize" her condition when seeing him.  AR946. There is a suggestion, too, in his letter to the Appeals Council that Ms. Patrick may have been reluctant to admit she felt improved at times:  "It should be noted that for anybody that is applying for disability I think that they believe in their minds that they can't show any signs of improvement when their claim is for mental illness because they would be judged functional if they did improve, . . ."  AR22.

Records from Dr. Christopherson and other mental health professionals show Ms. Patrick did have "ups" as well as "downs."  On March 7, 2016, she was living alone in a mobile home with her two sons.  AR618.  At this time, she reported she was unable to cook for her family and that her mother cooked for them.  AR619.  She reported having a learning disability and difficulty retaining information.  AR620.  In fact, Ms. Patrick had a learning/reading disability and attended special education classes until she dropped out of school after the 10th grade, earning her GED thereafter.  AR992-93.  Weekly counseling sessions were planned at this point.  AR621-22.

Although 2016 counseling records indicate Ms. Patrick's mother moved in with her shortly after March, 2016, in order to help care for Ms. Patrick, records from 2017 indicate Ms. Patrick's mother lived apart from her in her own home, but visited Ms. Patrick regularly. <u>Compare</u> AR625, <u>with</u> AR1043, 1048. Ms. Patrick reported her eldest son also helped her. AR629. Ms. Patrick points to this evidence in support of her argument that the ALJ got it "backward" when it stated that Ms. Patrick regularly helped out her mother, grandmother, and sons. Ms. Patrick asserts the record showed the opposite— that Ms. Patrick *received* help from others rather than gave it. As will be seen below, there *was* support for the ALJ's finding that Ms. Patrick helped her family members.

Ms. Patrick's functioning fluctuated. She was able to help her grandmother bathe and do household tasks, go out to dinner, began making meals for her family, walking 45 minutes per day, playing cards, visiting a cousin's home to see a newborn baby, babysitting her cousin's children, care for her mother when she was sick, go shopping, go to movies, attend concerts, attend food drives/give-aways, volunteer at the animal shelter, take care of pets, take her son to the dentist, run errands, pack up her house and move into a new apartment, host Thanksgiving at her home and do the cooking with her mom, go with her uncle to his medical appointment, cook nearly every day with her mom, host guests for a long weekend, do a lot of cleaning, throw a party for her uncle, and clean out three cars in one day in the heat. AR635, 650-56, 657, 663, 668, 691-93, 730, 734, 739, 748, 785, 791-92, 802, 805,

810, 817, 827, 830, 847, 861, 938, 1043, 1048, 1179-1226. Ms. Patrick's mother was 65 years old, had cardiac problems, and was legally blind. AR657, 1040. And Ms. Patrick was the representative payee for her sons' disability payments. AR33. As to her mother, and other family members, it is clear Ms. Patrick did provide significant assistance. No doubt she was on the receiving end of assistance quite frequently too. Even some of Dr. Christopherson's records demonstrate she was "doing quite well" and "the best he had seen" in some months. AR1175.

But at other times Ms. Patrick reported not being able to get off the couch, slipping into depression again, unable to cook even canned soup, AR674. On June 24, 2017, Ms. Patrick took 16 Excedrin migraine tablets in an attempt to harm herself. AR1066. She reported the incident to her case manager, who instructed her to go to the emergency room, which she did. AR1066, 1076, 1232. Two days later, her case manager completed a petition to have Ms. Patrick involuntarily committed to HSC. AR1234. Ms. Patrick reported she took the pills because she was angry, had been trying to fall asleep and could not. AR1043.

After Ms. Patrick's discharge from HSC after a 10-day stay, her records showed her doing "remarkably well." AR1243. HSC found a significant factor in Ms. Patrick's depression was that she was extremely over-medicated with narcotics and diet drugs—to the point that she slurred her words. AR992, 1039, 1044, 1047, & 1059. The HSC staff gradually took her off narcotics (Fentanyl and Hydrocodone) and diet drugs (Focalin), the slurring went away

and Ms. Patrick herself reported her mood improved immeasurably. AR1058-60. Her records describe no other significant downturns in her mood between her July 7, 2017, HSC discharge and the October, 2017, ALJ hearing.

Returning to the legal analysis that must apply to the court's review of the ALJ's mental RFC finding, there must be some medical evidence in support of the RFC determination, but RFC is an ultimate issue entrusted to the Agency. Also, the court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. Woolf, 3 F.3d at 1213; Reed, 399 F.3d at 920. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst, 2 F.3d at 250.

Here, the ALJ formulated a mental RFC that limited Ms. Patrick to understanding and remembering short, simple instructions. AR34. And, her work was to be limited to goal-oriented work. AR35. These limitations accommodate her learning disability and pain-related distractibility.

She was limited to interacting with supervisors and co-workers only occasionally (1/3 of the day). Id. She was to have no interaction with the public. Id. She was to work in isolation or in small groups of no more than 5 or 6 persons. AR34-35. These limitations took into account Ms. Patrick's social anxiety.

Ms. Patrick alleges error because the ALJ did not take into account missed work days due to her depression. But that decision, too, is supported

by substantial evidence in the record. In addition, Ms. Patrick reported her depression appeared approximately two years before her commitment at HSC, a period of time that coincides with extraordinary increases in Ms. Patrick's narcotic pain drugs and, later, diet drugs. When these drugs were removed from her daily regimen, Ms. Patrick reported and Dr. Christopherson observed a great improvement in her *mood.* Once these drugs were removed, Ms. Patrick enjoyed a several-month period right before the ALJ hearing where she experienced no significant downturn in her mood. Even before the change in her medications, Ms. Patrick's ADLs demonstrated a wide-ranging variety of activities undertaken on a very regular basis, including walking for 45 minutes on her treadmill every day, going to a variety of community events, helping her family members, volunteering, caring for her pets, throwing parties for family members, hosting company at her house over a long weekend, and caring for herself.

The court finds the ALJ's mental RFC to be supported by substantial evidence in the record as a whole. Perhaps a more limited RFC would also be supported by the record. But that is not this court's task. Instead, even if another conclusion can be drawn, the court must affirm if the conclusion the Commissioner *did* draw is supported by substantial evidence. The RFC is supported by some medical evidence, but need not adopt *intoto* a single specific medical opinion. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). The court concludes it is and affirms the ALJ's mental RFC decision.

**H.    Step Five**

Ms. Patrick raises two issues at step five.  First, she alleges the VE did not identify jobs available in Ms. Patrick's region or in several regions of the nation and so did not satisfy the Commissioner's burden at step five.  Second, she alleges the DOT descriptions of the jobs identified by the VE did not correspond to the mental RFC determined by the ALJ.  The Commissioner argues the jobs did correspond to the ALJ's RFC and that the VE did properly identify the numbers of jobs available "nationally."  The Commissioner therefore asks the court to affirm the agency's decision.

**1.    Jobs Available "Nationally"**

At step five, the ALJ found there were other jobs Ms. Patrick could perform within the RFC as formulated by the ALJ.  AR40.  The ALJ's conclusion was based on testimony from the VE that there were 38,000 document scanner, 175,000 laundry worker, and 34,000 routing clerk jobs available "nationally."  AR40, 87.  By testifying to the number of jobs available in the entire United States, Ms. Patrick alleges the VE and the ALJ used the wrong standard.  Her argument is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d)    "Disability" defined

(1)    The term "disability" means—

(A)    Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

\* \* \*

(2)     For purposes of paragraph (1)(A)—

     (A)     An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law. It does not mean work in the entire United States. Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country." Id. (emphasis added). Now, what does that definition mean exactly?

The Commissioner cites several cases which simply do not answer the question. Some of the cases merely parrot the language of the statute— "national economy"--without discussing what that term means under circumstances where the number of jobs was not a contested issue. See Matthews v. Eldridge, 424 U.S. 319, 336 (1976); Weiler v. Apfel, 179 F.3d 1107,

1110-11 (8th Cir. 1999); <u>Whitehouse v. Sullivan</u>, 949 F.2d 1005, 1007 (8th Cir. 1991); and <u>Janka v. Sec. of Health, Educ. & Welfare</u>, 589 F.2d 365, 370 (8th Cir. 1978).

The Commissioner cites other district-court-level cases, which are not binding on this court, which appear to conflate "national economy" with numbers of jobs existing "nationally," but ultimately affirmed the ALJ because the VE also considered the number of jobs existing in the plaintiff's state.  <u>See Haller v. Astrue</u>, 2012 WL 2888801 at *11 (W.D. Ark. July 16, 2012) (quoting the language of the statute—"national economy"—and noting that the VE also considered the number of jobs available in Arkansas); <u>Craig v. Chater</u>, 943 F. Supp. 1184, 1191 (W.D. Mo. 1996) (affirming where the VE testified to the number of jobs available nationally and also to the number available in Missouri).  None of the cases cited by the Commissioner equate the term of art in the statute—"national economy"—with the word "nationally."

To adopt the Commissioner's position—a position repeatedly asserted before this court in a number of Social Security appeals—would be to disregard a portion of the statutory language.  The statute states clearly *" 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."*  42 U.S.C. § 423(d)(2)(A).

The Commissioner would have this court ignore this plain statutory mandate.  This, the court cannot do for the Supreme Court teaches that every provision of a statute must be given effect when construing it:  where a statute

104

can be interpreted so as to give effect to all portions of the statute, that interpretation must prevail over an interpretation that nullifies some portion of the statute.  Morton v. Mancari, 417 U.S. 535, 551 (1974).  "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 665 (2007) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).

Congressional intent is clear:  the Commissioner *does* have to show that jobs exist in Ms. Patrick's "region" or in "several regions of the country."  42 U.S.C. § 423(d)(2)(A).  We know from the statutory language that "region" does *not* mean "immediate area."  Id.  The Commissioner's regulation likewise does not define "region," but only says that "region" is not equal to "immediate area." 20 C.F.R. § 404.1566(a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region.  This sentiment is paralleled in the Commissioner's regulation where it states:  "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'  We will

not deny you disability benefits on the basis of the existence of these kinds of jobs." 20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part." Webster's New World Dictionary, at 503 (1984). "A subdivision of the earth or universe." OED (3d ed. Dec. 2009). We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country, nor does it mean the claimant's immediate area. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b). The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.

The court concludes, as it must, that "national economy" does not mean "nationally." Instead, at Step 5, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation). Id. The VE did not testify to numbers of jobs existing in Ms. Patrick's region or in "several regions," so the testimony fails to provide support for the ALJ's step five determination. The burden is on the Commissioner at step five. Here, he failed to carry that burden. The court will remand for a reconsideration and redetermination of the ALJ's step five analysis.

### 2. DOT Descriptions of Jobs and the ALJ's Mental RFC

Ms. Patrick asserts the DOT jobs identified by the VE and which were adopted by the ALJ contain requirements that the worker be able to perform at

Reasoning Level 2 or above. However, the ALJ formulated Ms. Patrick's mental RFC to include understanding and following only "simple instructions." AR34. Ms. Patrick asserts that only jobs defined by the DOT as requiring Reasoning Level 1 are limited to "simple instructions." <u>Hulsey v. Astrue</u>, 622 F.3d 917, 923 (8th Cir. 2010). Thus, there is a discrepancy in the record between the mental RFC formulated by the ALJ and the DOT descriptions of the jobs which the VE testified could be performed by Ms. Patrick. The Commissioner disputes this and argues that Reasoning Level Two is commensurate with Ms. Patrick's mental RFC.

Reasoning Level Two under the DOT is described as: "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." <u>See</u> occupationalinfo.org/appendxc_1.html.

Reasoning Level One under the DOT is described as: "apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." <u>Id.</u>

The ALJ held Ms. Patrick had the mental RFC to understand, remember, and carry out "short, simple instructions." AR34. This description does not match either Reasoning Level One or Two exactly, but it is much closer to Reasoning Level One. Level Two requires the ability to understand "detailed" written or oral instructions. This is the antithesis of "simple." But in fashioning the mental RFC, the ALJ did not limit "short, simple instructions" to

"one- or two-step instructions" as specified for Reasoning Level One.  Because the court has already found an error at step five requiring remand, the court will instruct the Commissioner upon remand to revisit the DOT descriptions of the jobs identified by the VE and determine if they are in fact congruent with the mental RFC formulated by the ALJ.

## I.     Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Patrick requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering

the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the step five record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED August 15, 2019.                    BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge